UNITED STATES DISTRICT  COURT
DISTRICT OF COLUMBIA
_____

UNITED STATES OF AMERICA,


    - against -                                              08 CR 147 (RJL)


TIJANI AHMED SAANI,


                              Defendant.


_____


SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
THE DEFENDANT TIJANI SAANI'S APPLICATION
FOR RELEASE ON BAIL PENDING TRIAL

PATRICIA A. PILEGGI
747 3rd Ave.
32nd Floor.
New York, NY 10017
(212) 425 – 3391
ppileggi@paplaw.com

SUSAN G. KELLMAN
25 8th Avenue
Brooklyn, New York 11217
(718) 783-8200
kellmanesq@aol.com

JOHN LAURO
Lauro Law Firm
101 East Kennedy Boulevard
Suite 3100
Tampa, Florida 33602
(813) 222-8990
jlauro@laurolawfirm.com

## PRELIMINARY STATEMENT

On May 14, 2008, at the conclusion of a detention hearing, United States Eastern District of New York Magistrate Judge Bloom set a bond in the amount of $500,000, secured by the signatures of Tijani Saani's wife, two brothers who reside in Ohio, and a home owned by one of the brothers in Ohio.  In addition, Magistrate Bloom ordered that Mr. Saani be subject to electronic monitoring once Mr. Saani determined where he would be residing in the United States.  She also ordered that his passports be turned over to the Government. (Exhibit A).

The Government obtained a stay of Magistrate Bloom's order, so that it could appeal her decision to this Court.  This Court has agreed to consider the Government's appeal of Magistrate Bloom's release order.

It is respectfully submitted that the bond set by Magistrate Bloom is more than adequate to secure the presence of Tijani Saani to face the one count indictment, charging the filing of a false tax return, presently pending in the United States District Court for the District of Columbia.

## THE CHARGES AND CURRENT STATUS

Tijani Saani was arrested on May 7, 2008, at John F. Kennedy International Airport, on a complaint charging a violation of 26 U.S.C.§ 7206 (1).  Specifically, he was charged with failing to disclose that he had foreign bank accounts on his 2005 Federal tax return.

On May 14, 2008, at the conclusion of a detention hearing, Magistrate Judge Bloom ordered, consistent with the recommendation of the Pretrial Services Officer,[1] that Tijani Saani be released on a $500,000 bond secured by the signatures of Tijani Saani, his wife,

---

[1] The pretrial services officer recommended that Mr. Saani be released on a "substantial cosigned bond."

Barbara, and his brothers Ahmed and Sallahu.  The bond was also secured by Ahmed Saani's

residence in Ohio.  Tijani Saani was ordered to surrender all passports[2] and ordered not to travel

outside of the United States.  In addition, Magistrate Bloom ordered that Mr. Saani be subject to

electronic monitoring.  (Exhibit A, pages 26 - 32). On May 15, 2008 the Government sought and

obtained a stay of Magistrate Bloom's order authorizing the release of Tijani Saani.

On May 16, 2008, the Government obtained a one count indictment against Tijani

Saani, charging that he filed a false tax return, in that he failed to disclose foreign bank accounts

on his 2005 U.S. tax return, in violation of 26 U.S.C.§ 7206 (1).

## PROPOSED BAIL PACKAGE

We respectfully submit that the bond set by Magistrate Bloom is more than

adequate to secure Tijani Saani's presence to face the tax charge currently pending against him.

Tijani Saani intends to reside in his Flossmoor, Illinois home.  If this Court

believes it necessary, he would be willing to post this residence as collateral to secure the bond.

This home has a fair market value of $400,000 and is not encumbered by a mortgage.  (Exhibit

B).

## STATEMENT OF FACTS

Tijani Saani, his wife, Barbara, and their four children, ages 3, 4, 27 and 31 are all

United States citizens.

Tijani and his wife both attended Central State University in Wilberforce, Ohio.

Mr. Saani went on to obtain an M.B.A. from Bowling Green State University in Bowling Green,

Ohio.  After receiving his M.B.A., Mr. Saani obtained employment with the United States Air

---

[2] Tijani Saani had a US passport, a Ghanaian passport, and a diplomatic passport, all issued in his name.

Force.  Barbara Saani was a member of the United States Air Force, achieving the rank of Staff Sergeant.  She retired, after 10 years of service, on a disability pension.

Mr. Saani has been employed by the United States Air Force for his entire career. The Saani's resided in Cincinnati, Ohio for approximately the first three years of Mr. Saani's employment.  They then moved to Oklahoma and resided there for a period of three years.  After that, they resided in Florida for approximately three years.  From Florida, the Saani's moved to Kuwait where they have lived for the past 14 years.

The Saani's older daughters both reside and work in the United States.

Barbara Saani was born and raised in Chicago.  She has five brothers and two sisters, and more than 30 nieces and nephews, all of whom reside in the United States.  Four brothers and one sister reside in the Chicago area – not far from the Saani's Flossmooor, Illinois residents.  Her remaining brother and sister reside in Ohio and Wisconsin.  She has an elderly uncle and aunt who also reside in Chicago.

In 2002, the Saani's purchased a residence in Flossmoor, Illinois in order to have a home close to Barbara Saani's family.  That home has a fair market value of approximately $400,000 and is not encumbered by a mortgage.  For the past six years, the Saani's have returned to that home between three and four times a year to spend time with family members who reside in Ohio, Illinois and elsewhere in the United States.  That home is used exclusively by the Saani's.  The gas records which have been attached as an exhibit show increased gas usage on those occasions, particularly on their annual visits in December, when the Saani's return to this home.  (Exhibit C). The Saani's pay for a variety of services in order to maintain this home, including lawn service; garbage disposal; electricity; and property taxes. (Exhibit D).  Both

Barbara and Tijani Saani have doctors in Flossmoor, Illinois. (Exhibit E). In addition, the family has obtained a library card for a library in the area. (Exhibit F).

When returning to the United States on May 7, 2008, Tijani Saani, accompanied by his wife, intended to (1) explore housing in the Atlanta, Georgia area; (2) see his doctor in Flossmoor, Illinois; and (3) go to a job interview with the U.S. Department of State in Washington, D.C. After attending to these matters, Mr. Saani planned to return to Kuwait, ship his family's belongings to Flossmoor, Illinois residence, and, at the end of June, report to the Dobbins, Georgia military base for work. His wife planned to spend some time during June and July, living in their Flossmoor Illinois residence with their youngest children and visiting with her family who live in area. Unfortunately, because of his arrest on the pending charge, he lost his job in Dobbins, Georgia and has lost the opportunity to interview with the Department of State in the District of Columbia.

Because the Saani's had not yet obtained housing in Georgia, in May, the Saani's arranged for of all of their belongings in Kuwait to be delivered to their Flossmoor, Illinois home (Exhibit G).

Tijani Saani's brother, Ahmed Saani, resides in Columbus, Ohio. He has agreed to secure the bond with his residence. He is employed by a bank, is married and has two daughters, ages 7 and 10. Another brother, Sallahu, is employed, married, has two children and also resides in Columbus, Ohio.

After his brother's arrest, Ahmed Saani travelled to Kuwait to obtain Tijani Saani's U.S. passport, and his Ghanian passport, so that these documents could be turned over to the Government. Those passports, and other documents, were seized from Ahmed as he entered

the United States through John F. Kennedy International Airport by Special Agent Gregory

Shilling of the United States Army Criminal Investigation Division.

At the present time, the Saani's youngest children are in the care of Barbara

Saani's sister, who lives a short distance away from their Flossmoor, Illinois home.

If released on bail, Tijani Saani wishes to return to his home in Flossmoor,

Illinois and obtain employment in that area.

## ARGUMENT

The Bail Reform Act embraces a presumption against detention.  "In our society

liberty is the norm and detention prior to trial or without trial is the carefully limited exception."

*United States v. Gloster*, 969 F.  Supp.  92, 96 – 97 ( D. D.C. 1997) (quoting *United States  v.*

*Salerno*, 481 U. S.  739, 755, (1987)).  The Bail Reform Act requires the release of the defendant

on the "**least restrictive**" conditions necessary to "reasonably assure the appearance of the

person as required and the safety of any other person and the community."  *See* 18 U.S.C. § 3142

(c) (1) (B) (emphasis added).  When seeking detention of an individual on the ground that he

poses a risk of flight, the government is required to establish by a "preponderance of the

evidence" that no combination of conditions can "reasonably" assure that the defendant will

appear for trial.  *United States  v.  Xulam*, 318 U.S.App.D.C.1 (D.C. Cir. 1996).  The record

reflects, and Magistrate Bloom reasonably held, that the Government failed to sustain this

burden of proof.

18 U.S.C.  § 3142 (g) sets out relevant factors in the determination of "whether

there are conditions of release that will reasonably assure the appearance of the person as

required." Those factors include:

(1)    The nature and circumstances of the offense charged, including "whether the offense is a crime of violence, a federal crime of terrorism, or involves a minor victim or controlled substance, fire arm, explosive, or destructive device";

(2)    The history and characteristics of the person, including
      (a) the person's character, physical and mental condition,
      (b) family ties,
      (c) employment,
      (d) financial resources,
      (e) length of residence in the community, community ties,
      (f) past conduct,
      (g) history relating to drug or alcohol abuse,
      (h) criminal history, and
      (i) record concerning appearance and court proceedings; and

(3)    The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

When applying these legal principles, and the factors set out in the Bail Reform Act, it is clear that the bond set by Magistrate Bloom imposes the least restrictive conditions necessary to reasonably assure the appearance of Tijani Saani. The Government has failed to establish by a preponderance of the evidence that Tijani Saani, under the conditions set by Magistrate Bloom, poses a risk of flight.

<u>Nature and Circumstances of the Offense Charged</u>

Tijani Saani has been charged in a one count indictment with filing a false tax return. That count alleges that Saani failed to disclose the existence of foreign bank accounts on his 2005 tax return. Obviously, this is not a crime involving violence, terrorism, controlled substances, firearms or other dangerous instrumentalities. The Government has not alleged that Tijani Saani has failed to report income or that he has any unpaid tax liability. Under the Sentencing Guidelines, the Offense Level would be a Level 6 which calls for a sentence of 0 to 6 months. U.S.S.G. §§2S1.3, 2T1.1. Given Tijani Saani's background, even if convicted, he is not realistically facing a term of imprisonment.

<u>Tijani Saani's Character, Physical and Mental Condition</u>

Tijani Saani has an unblemished 22 year record as a civilian employee with United States Air Force. He is three years away from retirement. He attended college and obtained his M.B.A. in the United States. He has been married for 28 years and has four children – all of whom are United States citizens. His older daughters are both gainfully employed and reside in Orlando, Florida and Nashville, Tennessee.

At the time of his arrest, Mr. Saani planned to report to work in June at the Air Force Base in Dobbins, Georgia. He was also exploring a possible position with State Department in the District of Columbia. He intended, after 14 years in Kuwait, to return to the United States to work and to live. In addition, Mr. Saani was hoping to achieve three more years of federal service so that he could retire on a federal pension.

Mr. Saani has no history of alcohol or drug abuse.

<u>Family Ties</u>

Mr. Saani has substantial ties to family in the United States. In addition to his two brothers who reside in Ohio, both of his adult daughters reside in the United States.

Mr. Saani has very close ties to his wife's family, who reside in the Chicago area. Barbara and Tijani Saani purchased their house in Flossmoor, Illinois so that, whenever possible, they can return home to be near her family.

<u>Community Ties</u>

Prior to their 14 year stint in Kuwait, the Saani's resided in the United States for approximately 14 years. Barbara Saani was born and raised in Chicago, Illinois and remains very close with her family – most of whom reside in that area.

In order to maintain those ties to Barbara Saani's family, the Saani's purchased their Flossmoor, Illinois residence.  Their utility bills reflect that the fact that they return to that home  three to four times a year.  (Exhibits C and D). They have regularly scheduled doctors visits with doctors in that area.  (Exhibit E). The family has a library card for a library in Flossmoor, Illinois.  (Exhibit F).

Past Conduct

Mr. Saani has no criminal convictions.

Danger to the Community

The Government has not and cannot allege that Mr. Saani poses any danger to the community.

The D.C. Court of Appeals analysis in *United States v. Xulam*, 318 U.S. App. 1 (D.C. Cir.1996) is instructive.  In that case, the defendant was not a citizen, was charged with making a false statement on a passport application and was facing deportation.  The facts of that case are strikingly similar to those presented here.  Xulamwas faced a nonviolent charge carrying a maximum of six months under the Sentencing Guidelines, had no criminal record or record of failure to appear, he was employed, and the Government acknowledged that he posed no threat to the community.  Despite the fact that the defendant was facing deportation to Turkey, where as a Kurd he might be persecuted, the D.C. Court of Appeals concluded that the government had not satisfied its burden of showing a risk of flight.  The Court noted that the government had taken away all of his passports and travel documents and concluded that it was unlikely that he could could go far even if he wished to.  *Cf. United States v. Friedman*, 837 F.2d 448, 49 - 50 (2d Cir. 1988).  (Vacating pretrial detention order on the grounds that government had not established risk of flight; although the charges for sending and receiving child pornography were

serious, chance of flight was reduced by absence of prior criminal record, lack of known ability

to flee, employment, and family and community ties); *United States v. Himler*, 797 F.2d 156 (3d

Cir. 1986)(reversing pretrial detention order because government did not show risk of flight by a

preponderance of evidence; even though the defendant was clearly capable of obtaining false

identification, as demonstrated by prior conviction for crime involving fraudulent identification,

family ties and  past record of appearing in court as required diminished defendant's flight risk).

The Government cites a number of cases in support for the proposition that

"[d]etention in this case is fully consistent with the practice of other courts faced with similarly

sophisticated defendants." (Government Reply Memorandum, page 4).  In fact, each of the cases

cited undermines the Government's position and are illustrative of the types of cases in which

pretrial detention is appropriate. All of the cases relied upon by the Government reveal markedly

different fact patterns than those presented here.  In *United States v. Arndt*, 329 F.Supp 2d 182

(D.Mass. 2004), the defendant was charged with conspiracy to distribute and possession with

intent to distribute methamphetamine.  The defendant himself was a methamphetamine addict.

His only financial asset was a bank account with a balance of $3000.  He had prior convictions

involving identity documents.  He was charged in a separate case with, among other things, four

counts of rape of a child and assault and battery of a child.  The evidence of drug possession,

presented in great detail in the Court's opinion, was overwhelming.  *See also United States v.*

*Jamal*, 326 F.Supp.2d 1006 (D.Az.2003)(defendant charged with leading a large fencing

operation generating millions of dollars per year; conviction of one count would mandate a

sentence of 14 to 17 years under the Sentencing Guidelines; defendant possessed only minimal

assets in the United States, and faced the prospect of deportation)*;United States v. Cole*, 715

F.Supp 677 (E.D.Pa. 1988)(defendants charged with, among other things, money laundering,

interstate travel in aid of racketeering, and violation of the Arms Export Control Act; faced

maximum penalties in excess of 100 years of imprisonment and more than $5 million in fines;

stated in tape recorded conversations with an undercover agent that if they were arrested they

would leave the jurisdiction); *United States v. Minns*, 863 F.Supp 360(N.D.Tx. 1994)(defendant

was not a citizen and not lawfully admitted to the U.S. for permanent residence; possessed seven

passports from four different countries under five different names; used 13 different names;

applied for five passports using three different names while on probation for passport fraud; and

subject to a $30 million civil judgment and an $830,000 Internal Revenue Service levy); *United

States v. Levine*, 770 F.Supp. 460 (N.D.Ind. 1991)(defendant charged with conspiracy to commit

murder and faced life imprisonment; failed to comply with a grand jury subpoena; told family

members said he would rather die than go to jail; filed for bankruptcy; use several different

aliases for various purposes; remained in hiding for months after learning that he was under

investigation).

It is simply inaccurate to state, as the Government contends, that Mr. Saani's

domestic community ties are "nearly non-existent."  (Government Reply Memorandum, Page 1].

Clearly Mr. Saani has substantial ties to the United States.  Mr. Sanni, his wife and their four

children are all U.S. citizens.  He and his wife attended school here, and worked here, for

approximately 15 years before leaving to work in Kuwait.  He and his wife have many family

members who reside in the United States.  His two oldest daughters reside here.  Two of Mr.

Saani's brothers reside in Columbus, Ohio.  Mr. Sanni's wife of 28 years was born and raised in

the Chicago area and did not reside outside of the United States until she moved to Kuwait with

her husband.  Her  entire family resides in the United States – five brothers and two sisters, and

more than 30 nieces and nephews.  Most of her family resides in the Chicago, Illinois area close to the Saani's Flossmoor, Illinois residence.

It is also inaccurate to state that "there is no evidence that [Tijani] has ever lived [in the Flossmoor residence]" [Government Reply Memorandum, page 2].  There can be no question that the Flossmoor residence has been the Saani's "home away from home" for the last six years while stationed in Kuwait.  The home has been used exclusively by the Saani's.  The Saani's have maintained this home since 2002 so that they can visit family members who live in the area and easily visit family who live throughout the United States.

The Government has repeatedly made general allegations concerning Tijani Saani's access to substantial sums of money without specifying the names of the current account holders, account numbers, balances,  or sources of funds in these accounts.  Without  current detail as to account balances, sources of funds, and Tijani Saani's ability to access these funds, these allegations should be disregarded.  Assuming, but not conceding, the accuracy of these statements, Tijani Saani does not become a flight risk simply because he has access to large sums of money.[3]   Tijani Saani intends to contest the charge which is pending against him.  He has no intention of subjecting his family members to financial ruin, and to sever his ties to his many family members in the United States,  simply to avoid facing a charge which, even if he were convicted, realistically does not expose him to any term of imprisonment.

## **CONCLUSION**

Under all of the relevant factors, the bond set by Magistrate Bloom is more than adequate to assure the appearance of the Tijani Saani as required.  He is a U.S. citizen, married

---

[3]In fact, because the Air Force has paid for housing, phone, utilities, medical, automobile, and gasoline expenses, Mr. Saani has been able to the save money that he would have spent on those expenses.

to a U.S. citizen, with four children who are U.S. citizens.  He  is facing a one count indictment charging a non-violent, non-drug offense calling for 0 to 6 months if convicted. He has either been in college, graduate school or employed for all of his adult life – up until his arrest.  He enjoys good physical and emotional health.  He has never had a drug or alcohol problem or a criminal conviction.  He poses absolutely no danger to the community.  He has many family members, including his two adult daughters,  who reside in the United States.  He has particularly close ties to the Flossmoor, Illinois area where most of his wife's family resides.  In short, under the conditions of the bond set by Magistrate Bloom, he has absolutely no reason not to return to Court as required.

Dated: New York, New York
        June 1, 2008

Respectfully submitted,

/s/Patricia A. Pileggi
Patricia A. Pileggi, LLP
747 Third Avenue
32nd Floor
New York, NY   10017
ppileggi@paplaw.com

SUSAN G. KELLMAN
25 8th Avenue
Brooklyn, New York 11217
(718) 783-8200
kellmanesq@aol.com

JOHN LAURO
Lauro Law Firm
101 East Kennedy Boulevard
Suite 3100
Tampa, Florida 33602
(813) 222-8990
jlauro@laurolawfirm.com

1       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF NEW YORK

2

3 ---------------------------------X
              :
4 UNITED STATES OF AMERICA,  :
              : 08-MJ-00440
5    v.       :
      Plaintiff,  :
6              : 225 Cadman Plaza East
 TIJANI AHMED SAANI,    : Brooklyn, New York
7              :
      Defendant. : May 14, 2008
8 ---------------------------------X

9

   TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
10     BEFORE THE HONORABLE LOIS BLOOM
      UNITED STATES MAGISTRATE JUDGE
11

12 APPEARANCES:

13 For the Plaintiff:   ANN BRICKLEY, ESQ.
             U.S. Department of Justice
14            Public Integrity Section
             Criminal Division
15            950 Pennsylvania Avenue NW
             Washington, D.C.  20530-0001
16
             CATHERINE ALBRECHT, ESQ.
17

18 For the Defendant:   MARK J. HELLER, ESQ.
             PETER TOUMBEKIS, ESQ.
19            Heller & Heller
             425 Park Avenue South
20            5th Floor
             New York, New York  10022
21

22

23 Court Transcriber:   RUTH ANN HAGER
             Typewrite Word Processing Service
24            356 Eltingville Boulevard
             Staten Island, New York 10312
25

 Proceedings recorded by electronic sound recording, transcript
 produced by transcription service

2

1   (Proceedings began at 2:48 p.m.)

2         THE COURT:  Criminal cause for detention hearing,

3   USA v. Tijani M. Saani, 08-0440.

4         Counsel, your names for the record.

5         MS. BRICKLEY:  Ann Brickley for the United States.

6   Good afternoon, Your Honor.

7         THE COURT:  Nice to see you, Ms. Brickley.

8         MS. ALBRECHT:  Catherine Albrecht [Ph.] for the

9   United States.

10        THE COURT:  Good afternoon.

11        MR. HELLER:  Mark Heller from the law firm of Heller

12  & Heller, 425 Park Avenue, New York, New York in the United

13  States and my colleague Peter Toumbekis.

14        MR. TOUMBEKIS:  Good day, Your Honor.

15        THE COURT:  Good afternoon, Mr. Heller,

16  Mr. Toumbekis, and good afternoon to you, Mr. Saani.

17        THE DEFENDANT:  Good afternoon, ma'am.

18        THE COURT:  Mr. Saani, this was put over for your

19  application for bail and so I'm going to turn this over to

20  your attorney so that they can make their applications, sir.

21        THE DEFENDANT:  Yes, sir.

22        MR. HELLER:  Your Honor, when we met a little

23  earlier with the U.S. -- Assistant U.S. Attorneys and we

24  provided them with some documentation provided by family

25  members, this individual's brother who has a house in another

3

1  jurisdiction worth -- probably with an equity of about

2  $50,000.00 in that house.  We have some documentation

3  concerning it, as well as several tax returns of that

4  individual and another relative.  We just got called as we

5  were talking to the prosecutor in the hall to see if they

6  would be inclined to accept that as a bail package and I got

7  the impression that they felt that it was inadequate.

8         THE COURT:  Well, I'll let them make their own

9  argument on this.  I imagine that part of their concern

10 because Mr. Saani has been residing in Kuwait is the risk of

11 flight.  I imagine that's what it is, although I wouldn't

12 know --

13        MR. HELLER:  Well, Your Honor --

14        THE COURT:  -- for sure until I hear from them.

15        MR. HELLER:  He has been employed for in excess of

16 ten years, I think about 13, working for the United States

17 Government.  He is a United States citizen, as is his wife who

18 is present in court, and he has only been there pursuant to

19 his Governmental employment.

20        Interestingly enough, just in the interim of his

21 leaving Kuwait and coming to the United States, the Government

22 had transferred him to the United States to continue his --

23        THE COURT:  Well, that's good news.

24        MR. HELLER:  Yes.  To continue his work here.  He --

25        THE COURT:  Where is that going to be, down in D.C.?

4

1          THE DEFENDANT:  Dobbins Air Force base.

2          THE COURT:  And where is that?

3          THE DEFENDANT:  In Marietta, Georgia.

4          THE COURT:  You understand that these charges are

5   for you to face charges in the District of Columbia?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  But you're going to have to make

8   yourself present in the District of Columbia whenever the

9   Court tells you you need to be there; that's the big part of

10  your obligation if you're released.

11         THE DEFENDANT:  Yes, I will.

12         THE COURT:  So the bail package, from what I

13  understand, is to have the people that are in court sign for

14  him and to also have this brother's property posted.

15         MR. HELLER:  Of course.  In addition, obviously

16  they -- I think they already have possession of his passport,

17  but if they don't, we'll make sure that they get it.

18         THE COURT:  And whatever Pretrial Services

19  requires --

20         MR. HELLER:  Exactly.

21         THE COURT:  -- as far as monitoring.  So he will be

22  at the Air Force base in Georgia.  That's where he will be

23  working?

24         THE DEFENDANT:  I was due to start a job on the 25th

25  of May is my start date, but since the 7th of May when I was

5

1  arrested I have lost contact with the --

2          MR. HELLER:  All right.  In other words, basically

3  what he wants to convey is that his start date was the 25th

4  and he has been incarcerated in this interim period, so we're

5  not sure if it -- I assume it's still his start date, but he

6  came in a little earlier so he could organize --

7          THE COURT:  But, Mr. Heller, what I'm going to ask

8  is the arrest won't have an affect on his status in service?

9          MR. HELLER:  No, it will not.

10          THE DEFENDANT:  No.

11          THE COURT:  Okay.

12          MR. HELLER:  Because obviously he's innocent till

13  proven guilty and he's got --

14          THE COURT:  I'm just making sure.

15          MR. HELLER:  -- a clean record.  No, no.  I

16  understand.

17          THE COURT:  I want to make sure that we know where

18  we could expect --

19          MR. HELLER:  Sure.

20          THE COURT:  -- to find him if he was to be released.

21          MR. HELLER:  Let me say this in response to you,

22  Your Honor.  I conferred over the weekend with his wife and

23  she has initiated some process of getting residency here in

24  New York during this interim period because she has two infant

25  children.  So actually, which will be of even greater interest

6

1  to this court, in the interim period, his family, his wife and

2  his two kids will be based here in New York and will provide

3  you with a specific address.  Of course, he understands

4  whether he travels from --

5          THE COURT:  What's the interim period mean?  I'm

6  sorry.

7          MR. HELLER:  Well, right now until he starts his

8  employment.

9          THE COURT:  Well, but he's going to have to report

10 by the 25th, that's a -- it's 11 days --

11         MR. HELLER:  I understand.  So --

12         THE COURT:  But what I'm asking is he has two infant

13 children with his wife?

14         MR. HELLER:  Yes, his wife is present today.

15         THE COURT:  How old are his children?

16         THE DEFENDANT:  Three and four.

17         MR. HELLER:  Three and four years old and they've

18 been residing in Queens in the interim and --

19         THE COURT:  And then they will reside with him --

20         MR. HELLER:  Wherever he is.  They probably get

21 housing --

22         THE COURT:  -- there in Georgia?

23         MR. HELLER:  -- on the base.

24         THE COURT:  Then was your wife in Kuwait with you?

25         THE DEFENDANT:  Yes, ma'am.

7

1          MR. HELLER:  He had been residing in the Embassy in

2   Kuwait.  He's actually got diplomatic status when he

3   travels -- he travels out of the United States he's considered

4   diplomatic status.

5          THE COURT:  Mr. Heller, give me a moment.  Does his

6   wife work?

7          THE DEFENDANT:  No, she doesn't.

8          THE COURT:  Okay.

9          MR. HELLER:  She's [inaudible] --

10          THE COURT:  The brother who's here --

11          MR. HELLER:  Yes, he works and we have his tax

12   returns and he has another brother.

13          THE COURT:  And that's his -- the other brother --

14   so there are two brothers that are with him [inaudible] --

15          MR. HELLER:  His other brother came in for the last

16   court proceeding.

17          THE COURT:  I just want to know.  Are there --

18          MR. HELLER:  There are two brothers.

19          THE COURT:  -- two brothers.  They're both employed.

20   One is putting up a residence.

21          MR. HELLER:  Right.

22          THE COURT:  And where is the residence?

23          THE DEFENDANT:  Columbus, Ohio.

24          THE COURT:  Columbus, Ohio.  Okay.  Stop for a

25   second and let me ask the Government to place on the record

8

1   what their position is.

2          MS. ALBRECHT:  Your Honor, we oppose the defendant's

3   bail package proposal for a variety of reasons, but we'll put

4   on the main one, which is that we think is a very serious risk

5   of flight.  I'd also like to clarify -- I'll lay out the

6   reasons, but I'd also like to clarify some factors that were

7   laid out that the Government has a very different

8   understanding of.

9          Most importantly would be Mr. Saani's employment

10  status.  Although they said that he was scheduled to report to

11  Dobbins Air Force Base on May 25th, in fact Mr. Saani did not

12  confirm that is the start date.  He was trying to push the

13  start date back to sometime in the summer and was still

14  interviewing for other jobs.

15         In addition, the Government learned this morning

16  that that job offer is no longer available so the Dobbins job

17  is not currently on the table is our current understanding as

18  of a few hours ago.  I think it's likely that some of the

19  other jobs that he's interviewing for, one of which is the

20  Department of State, probably is also not on the table in

21  light of the recent charges.

22         Mr. Saani does not have --

23         THE COURT:  That is too bad actually because, again,

24  that would have given an easy way for you to monitor where he

25  was and he has a long history as an employee of the Department

9

1    of the Air Force.

2           But again, if you're saying that he didn't know

3    about this until now that doesn't mean that he's not been

4    forthcoming with the Court.  He can't be forthcoming with

5    things he doesn't know about.

6           MS. ALBRECHT:  Well, except that he had not

7    confirmed the start date May 25th with the Air Force.  That

8    was not their understanding that he was going to report on the

9    25th.  He had a return date to Kuwait on May 22nd.

10          THE COURT:  Mr. Heller, your client's wife is

11   waving --

12          MR. HELLER:  Yes.  I know what she's about to say.

13   I know what she's about to say.  The plan was, Your Honor,

14   without even asking them because they told me about it, they

15   were flying into New York.  They -- my client's wife has

16   family in Ohio and also I think in Florida.  They -- what?

17          THE DEFENDANT:  Illinois.

18          MR. HELLER:  Illinois.  They were coming in

19   preliminarily to arrange for transportation of their property

20   from Kuwait here.  In fact, their property -- some of their

21   furnishings and even some governmental equipment, about

22   $30,000.00 of equipment is still in Kuwait and they were

23   coming in to arrange housing, to arrange transportation, to

24   visit family, and to try to facilitate these things before he

25   was actually starting employment.

10

1           Now, it would surprise me if the U.S. Government is

2   terminating -- counsel just said she found that out an hour

3   ago.

4           THE COURT:  You know what, Mr. Heller?  We don't

5   need to get to all these things.

6           MR. HELLER:  Okay.

7           THE COURT:  I just -- I didn't want to not address

8   that Mr. Saani's wife had something to make as a point.

9           MR. HELLER:  Right.

10          THE COURT:  But I don't need all of your argument.

11          MR. HELLER:  I got you.

12          THE COURT:  Because again, I just want to --

13          MR. HELLER:  I think I'm --

14          THE COURT:  -- know what the Government's position

15  is.

16          MR. HELLER:  Sure.

17          THE COURT:  I don't see how this person could not be

18  bailable.  The Pretrial Services report says to me that I need

19  to get a substantial co-signed bond.  That's what they report.

20  Unless there's something really different that I don't see

21  here, I would set a bond, get the signatures on it, and set

22  whatever conditions might be reasonable to assure the

23  Government that he is not going to flip.

24          MS. ALBRECHT:  That's what I'd like to back up and

25  address.  The Government would concede that the charges that

11

1   are currently on the table don't carry substantial jail time,

2   but there is an ongoing investigation covering allegations of

3   significant bribery and money laundering.  There is --

4           THE COURT:  But I cannot be expected to take note of

5   charges that are not on the table.  How could the

6   Government -- I understand you have concerns because you know

7   more things than Mr. Saani and I do.  Of course, I could hear

8   your proffer but I have before me what I have before me.  I

9   don't have anything else.

10          I have an affidavit in support of a removal, which

11  is on a charge that's already been made and it's, again,

12  something that, of course, I could take into consideration if

13  you had the charges in your hand and you were serving them

14  right now in open court, but otherwise that there's an ongoing

15  investigation into more correctional wrongdoing is not going

16  to affect my bail determination on these charges.

17          MS. ALBRECHT:  The other things I'd like to address

18  are the history and characteristics of the defendant.

19          THE COURT:  Yes.

20          MS. ALBRECHT:  Which he's a dual citizen of the

21  United States and Ghana.

22          THE COURT:  And have you taken his passport?

23          MS. ALBRECHT:  We have his diplomatic passport but

24  his U.S. personal passport and his Ghanian passport were not

25  surrendered.

12

1          THE COURT:  [Inaudible]

2          MR. HELLER:  I offered it.

3          MS. BRICKLEY:  He's lived in Kuwait --

4          THE COURT:  You have them with you today?

5          MR. HELLER:  If you don't have it before he's

6   released -- I assumed they had it.  If they don't, we'll give

7   it to you before his released.

8          MS. ALBRECHT:  He's lived in Kuwait for the past 14

9   years and has no fixed U.S. address.  All of the people that

10  he's put up to sign this bond all have connections to Ghana.

11  I believe most of them are dual citizens as well.  Most of --

12         THE COURT:  I don't know what significance that

13  would have on determining whether they were sureters that the

14  Court could accept.

15         MS. ALBRECHT:  Well, it doesn't as far as making

16  them technically capable of being sureters.  I said that the

17  vast majority of his family lives in Ghana, not in the United

18  States.

19         THE COURT:  Well, if he came from Ghana then there

20  are going to be family members in Ghana.  That's not a reason

21  to keep somebody in jail.

22         MS. BRICKLEY:  He also has substantial assets to the

23  tune of hundreds of thousands of dollars, which when you

24  compare the amount of money he controls in offshore accounts

25  in countries including Ghana, but the amount of money they're

13

1   putting up right now, the amount here pales in comparison.  I

2   mean, they're talking -- and he also didn't disclose any of

3   these offshore accounts to Pretrial Services.

4           THE COURT:  I see that he has $520,000.00 disclosed

5   in the Pretrial Services report.  Is that different than what

6   you're saying he has?

7           MS. BRICKLEY:  Well, one of those is the residence

8   and I actually don't understand that there's $300,000.00 in

9   equity in his residence or -- I had [inaudible] residence the

10  home he owns in Illinois that is never lived in.

11          In addition, the Government has reason to believe

12  that he has millions of dollars in offshore accounts.

13  Specifically looking at the account in the Jersey Channel

14  Islands, which is laid out in the complaint, in 2007 less than

15  a year ago he was in receipt of $700,000.00 disbursement of

16  checks when that account closed.  None of that was disclosed

17  to Pretrial Services.  All of those checks were negotiated in

18  Ghana.

19          THE COURT:  Can I just ask is it clear that he's a

20  citizen, his wife is a citizen, and that his arrest record as

21  recorded here is correct?

22          MS. BRICKLEY:  My understanding is that it's all

23  correct.

24          THE COURT:  Okay.  Which also means that his two

25  infant children are citizens or have entitlement to

14

1   derivatives.

2       MS. BRICKLEY:  Well, my understanding of the two

3   children are actually adopted I'm not clear where they were

4   adopted --

5       THE COURT:  That doesn't --

6       MS. BRICKLEY:  I just don't know where they are in

7   the adoption process.

8       THE DEFENDANT:  They are U.S. citizens.  Correct.

9       MS. BRICKLEY:  Okay.

10      THE COURT:  You know, it's -- I understand your

11  concerns in the points that you're giving me.  I don't doubt

12  that what you're telling me is true that there's an ongoing

13  investigation.  I wouldn't generally have two attorneys for

14  one defendant standing up ready to make so many arguments

15  before we even get out of the gate if there wasn't other

16  things going on.  Okay.  But I still think looking at what I

17  have from Pretrial even with the discrepancies that you're

18  saying that he may have money that he didn't disclose, all

19  that that would mean is that I should set the bond in a higher

20  amount and not that I shouldn't set a bond because again if

21  you have his passports, if his wife and children are here, if

22  we set Pretrial Services to supervise I don't care in which

23  jurisdiction we say.  He thought he was going to Georgia.  You

24  don't think he's going to Georgia.  I'd like him to get

25  employment.  Whether or not he has money in the bank and other

15

1   places he's still -- New York is a pretty expensive place to

2   live.  He probably has skills that even if he doesn't go into

3   the civilian Air Force he probably has skills that he can use

4   in other industries, so I would like him to get a job.

5           So unless you have something else that you're going

6   to tell me, I'm ready to set a bond and it could be over the

7   Government's objection and you could do what you think you

8   need to do but -- first of all, do we have a date that he has

9   to appear down in D.C. because that's what this is to answer

10  to.  He has to answer to the charges in D.C.

11          MS. BRICKLEY:  Judge, we don't yet have a date.

12          THE COURT:  Okay.

13          MS. BRICKLEY:  We were waiting to find out what the

14  status was here.  I'll just note that if you do choose to

15  order a bail package in this case we are going to ask that you

16  stay your release order so that we can appeal it to the court

17  in the District of Columbia.

18          THE COURT:  That's fine.  They have the right to do

19  that, Mr. Saani, and they have the right to consider the

20  record here.  They can get it transcribed.  The Court will see

21  that I've taken signatures on it.  I would require you to

22  submit the Ghanese and the U.S. passport for --

23          MR. HELLER:  I just want to address that one point.

24  While you were talking somebody whispered that one of the

25  passports the U.S. Government has [inaudible] United States.

16

1  The second passport that they're talking about, which he

2  wasn't required to have when he traveled, is in his present

3  home in Kuwait.  Is that in a vault or --

4          THE DEFENDANT:  Yeah.

5          MR. HELLER:  And I think I remembered his wife said

6  it was in a vault, which I guess only he --

7          THE COURT:  Which was that passport?  That's the

8  Ghanese?

9          MS. BRICKLEY:  Your Honor, let me clarify.  He has a

10  diplomatic passport, which is what he travels on when he came

11  into the country last week.  He also has a domestic regular

12  citizen passport.  He did not have that with him when he came

13  into the country.

14          THE COURT:  He wasn't required to because he could

15  get entry --

16          MS. BRICKLEY:  That's correct.

17          THE COURT:  -- with a diplomatic passport.

18          MS. BRICKLEY:  He also has a Ghanian passport

19  presumably --

20          THE COURT:  Well, assuming that he's released,

21  assuming that the D.C. court -- I'm sure that there's a way

22  for the Government to put whoever needs to be on alert that

23  this other passport was not surrendered, but is not valid for

24  travel because, again, I would like to --

25          MS. ALBRECHT:  With respect to the American

17

1  passport, yes, Your Honor, but the Ghanian passport, the

2  United States has no control over it.

3         THE COURT:  I understand your point, but I also know

4  that if he says it's in Kuwait in a vault, there's very little

5  likelihood that I'm going to get that surrendered in the New

6  York court within the period of time that I'm imagining we

7  could get a bail package either approved or denied.  One or

8  the other.

9         So I would say that there can be an alert put on his

10  name.  I understand that you can invalidate an American

11  passport, but again what weighs in my mind on this case, and

12  let me put it on the record, is I have my Pretrial Services

13  agency report which states "To reasonably assure defendant's

14  appearance Pretrial respectfully recommends the defendant be

15  released on a substantial co-signed bond."

16         MS. BRICKLEY:  Your Honor, I apologize for the

17  interruption, but --

18         THE COURT:  I'm prepared to enter that.

19         MS. BRICKLEY:  -- after the Pretrial Services report

20  was prepared we came before Judge Azrack and pointed out

21  that -- and it's in paragraph 13 of the underlying

22  complaint -- this defendant received checks that total

23  $700,000.00 from the Jersey Channel Islands last year in July

24  of 2007.  He did not disclose the additional $500,000.00 to

25  Pretrial Services.

1          Now, I understand he may have spent that --

2          THE COURT:  I'm sorry.  I'm still trying to find

3    paragraph 13 of what you were referring me to.

4          MS. BRICKLEY:  The Government's underlying complaint

5    [inaudible] --

6          MR. HELLER:  Your Honor, I just want to note that

7    that's just an allegation.  It's not proven.

8          THE COURT:  Wait, wait, wait, wait.  The affidavit

9    that I have is the affidavit in support of the removal.  There

10   is no paragraph 13 unless I don't have a cold copy.  I want to

11   make sure I'm looking at --

12         MS. BRICKLEY:  Your Honor, we [inaudible] --

13         THE COURT:  -- what you're telling me I should look

14   at.

15         MS. BRICKLEY:  And we're going to get you a copy of

16   the underlying affidavit [inaudible].

17         THE COURT:  Thank you.  This was filed down in the

18   District of Columbia.

19         MS. BRICKLEY:  And it goes through the basis of the

20   charges --

21         THE COURT:  Just give me a moment.

22                    [Pause in the proceedings.]

23         THE COURT:  Okay.  But again, as Mr. Heller will

24   argue --

25         MS. BRICKLEY:  Your Honor, my point is that he lied

1  to Pretrial Services so when Pretrial prepared that report

2  [inaudible] --

3         THE COURT:  No, your underlying complaint against

4  him is based on that he has these other accounts.  He may

5  still maintain that he didn't lie.  I don't know, but I don't

6  have to resolve the underlying charge here to say that this

7  man can be bailed out on terms and conditions which would

8  assure his appearance.  He's a citizen --

9         MS. BRICKLEY:  I understand that but if they're

10  relying on the Pretrial Services report it's based on --

11         THE COURT:  He's got two child --

12         MS. BRICKLEY:  -- incorrect information.

13         THE COURT:  I can only rely on what happened at

14  Pretrial Services.  You want them to amend the report and you

15  think that he won't be bailable because of the allegations of

16  your agent, Troy Burris [Ph.], as to what the underlying crime

17  is.  They took into consideration that there was an indictment

18  pending down in D.C. and that the charge in D.C. was the

19  filing of false tax returns.  They've taken that into account

20  when looking at whether or not he could be bailed out.

21         Is there any other argument that you have to make

22  because otherwise I'm prepared to set bail and you can go down

23  and try to appeal the decision to the D.C. court.  My concern

24  here is the underlying charge is serious.  He needs to report

25  to face that underlying charge.  I don't believe that there

20

1  are no conditions under which the Court could release him

2  pending his reporting into D.C. on those charges.

3          He's got a wife who's a citizen who's ready to sign.

4  He's got two brothers who are citizens who are ready to sign.

5  He has two minor children.  I really don't understand why you

6  think just having money -- every corporate case there is

7  brought in this or the Southern District of New York, people

8  have money.

9          MS. BRICKLEY:  The difference, Your Honor, is this

10  individual has lived overseas for the past ten years.  I

11  understand.

12          THE COURT:  He worked for the Government.

13          MS. BRICKLEY:  I understand that, Your Honor, but

14  his wife, who is one of the potential signators also has lived

15  overseas for the past 13 years.  They have not had a residence

16  in the United States for [inaudible].

17          THE COURT:  And they will have to give the Court a

18  residence address.  That was one of the things that Mr. Heller

19  was trying to make as a point, which I stopped him from

20  because I didn't really think that that was important.  Of

21  course, if he was coming back for a job that he expected until

22  the moment you started speaking he still had in Georgia, he

23  wasn't going to go and get an apartment in New York if he had

24  to report to an Air Force base in Georgia.  That wouldn't make

25  sense.

21

1      Believing his tale, he was coming back to a job at

2  an Air Force base in Georgia.  You've now told him that's not

3  true.

4      MS. BRICKLEY:  Except, Judge, that when he was

5  arrested at the border he had round trip tickets to Kuwait

6  leaving May 22nd, three days prior to he was supposedly

7  starting a new job.

8      THE COURT:  But again, did I hear that until this

9  moment?

10      MS. BRICKLEY:  Yes.  Ms. Albrecht said it five

11  minutes ago.

12      THE COURT:  That he had round trip tickets in his --

13      MS. BRICKLEY:  His tickets came from Kuwait to the

14  U.S. on the 7th when he was arrested coming into the country

15  and he was set to return to Kuwait on the 22nd of May.

16      THE COURT:  Mr. Heller?

17      MR. TOUMBEKIS:  Judge, as Mr. Heller explained to

18  you and as the family has told us, the plan was for them to

19  come in.  They have pulled -- they're moving their entire life

20  to this Air Force base in Georgia.  They have started the

21  process.  Their plan was to come in and they had round trip

22  tickets going back to Kuwait and coming back again.  That's

23  why the ticket is --

24      THE COURT:  Is that true, that they had another

25  ticket coming back?

22

1          MR. TOUMBEKIS:  That's why --

2          MS. ALBRECHT:  [Inaudible] second ticket and he

3   represented to his employers in Kuwait that he wanted to spend

4   the summer traveling in Africa, not -- he wanted to begin his

5   job later in the summer so that he could take some time to

6   travel.  I'm sorry if we're repeating things and not giving

7   you [inaudible] Judge Azrack just a couple of times, which is

8   why she was disinclined to really [inaudible].

9          MR. TOUMBEKIS:  Judge, my client has given me the

10  full detail that'll help -- it makes it very simple and

11  understandable.  He tells me, as he has told me before, they

12  had a round trip ticket.  The plan was to come in, situate

13  their housing at the Air Force base, confirm it, fly back to

14  Kuwait where their belongings currently having getting

15  gathered and the Government was flying them from Kuwait with

16  all of their belongings, their entire life to the Air Force

17  base.  That was the entire plan.  Come here, spend a couple of

18  weeks, see what their plan is, where they're living at the Air

19  Force base, fly back.  Their belongings are being packed up by

20  how many people?  By --

21          THE DEFENDANT:  By the U.S. Government.

22          MR. TOUMBEKIS:  By the U.S. Government and then they

23  were going to be flown with their belongings on Government

24  paid-for aircrafts back to the Air Force base in Atlanta,

25  Georgia.

23

1          MS. BRICKLEY:  Your Honor, after he was arrested at

2    the border Homeland Security pulled his itinerary and it had

3    him flying to the District of Columbia for what we understand

4    as a job interview with Department of State.  It then had them

5    flying to Chicago.

6          Furthermore, the order to ship the housing out of

7    [inaudible] goods home had to go to Illinois, not Georgia.

8          THE COURT:  What does that matter?  Your

9    representation, though, to me was that they had a round trip

10   ticket to Kuwait.  You didn't tell me anything about them

11   coming back on any military transport.

12         MS. ALBRECHT:  We're not aware of that, Judge.  One

13   of the reasons --

14         THE COURT:  Well, what was this that she just said

15   that they were going to ship all the goods to Illinois?

16         MS. BRICKLEY:  The only reason I applied that is

17   because he just said the purpose of the trip here was to set

18   up their housing in Georgia and there's been no indication of

19   that whatsoever from any of -- from their itinerary that the

20   Government has seen [inaudible] Air Force --

21         THE COURT:  But this is the point.  I don't really

22   care if he was trying to get a better job with the Department

23   of State than the Air Force.  That doesn't matter to me.  What

24   you're trying to paint to me is that he had no plans to come

25   back to the country because he had a round trip ticket in his

24

1  pocket.  That's what I took that fact to mean, that I should

2  believe that he was coming to the country and he intended to

3  return to Kuwait.  In fact, then you said that his employer

4  said he plans to travel in Africa.

5          But then when they bring up the plan was to come to

6  the States, get situated, and then move all their things and

7  that the Government was moving all their things you said, in

8  fact, there was an itinerary but it wasn't to Georgia.  It was

9  to Chicago.

10         MS. ALBRECHT:  Can I clarify because I -- there's --

11 I think there's clearly been an miscommunication.  It was not

12 our understanding prior to his arrest that he never intended

13 to come back to the United States.  I think it's clear that he

14 is in the process of moving.

15         THE COURT:  But then why would you tell me that he

16 had a round trip ticket to Kuwait in the pocket as if that was

17 he intended to flee?  He wasn't coming back to the country.

18         MS. BRICKLEY:  The date -- the return date doesn't

19 jibe with the start date of the job at Dobbins Air Force Base.

20 What that goes to is the Government's discomfort that we're

21 going to be able to find him if he's released because we don't

22 know where he's going to go.

23         THE COURT:  We'll get electronic monitoring if

24 that's so important to you.

25         MS. ALBRECHT:  It is that important to us

25

1  [inaudible] --

2          THE COURT:  Then that's fine.

3          MR. TOUMBEKIS:  Judge --

4          THE COURT:  I mean, again, my concern here is he's

5  got a charge against him in D.C.  We've got to get him to that

6  charge, but we don't know the date, so that would have been

7  helpful to know he's expected to be there in two days.  Then

8  we could make the arrangements and plans for him to be there

9  to face the charge.  We don't know when it is.  Okay.

10          Two, he doesn't have a history or background which

11  would cause the Court to believe that he's not going to face

12  these charges.  There's no history of bench warrants, parole

13  being revoked, criminal history where he's accused of violent

14  crimes.  He has old things too that were some -- I don't

15  remember -- 15, 20 years ago.  Age 24 and 27 and he's 56 now.

16  Is that --

17          THE DEFENDANT:  Fifty-two.

18          MR. HELLER:  Fifty-two.

19          THE COURT:  Fifty-two.  I just made you older.

20  That's all I have.  So that the charges are serious.  Almost

21  every defendant who comes before the Court has serious

22  charges.

23          Anything else that you want to add at this point?

24          MS. ALBRECHT:  It doesn't sound like we're going to

25  persuade you, Your Honor, but that --

26

1          THE COURT:  That he needs to be detained?  No.

2          MS. ALBRECHT:  Fine, then there's nothing more to

3     say.

4          THE COURT:  You said that if the bail package was

5     insufficient.  That's where you started, ladies.  You said the

6     bail package was insufficient.  I didn't hear anything about

7     the bail package.  All I heard was that you don't believe the

8     story.  There are other charges.  You're investigating.  You

9     don't believe he's going to stay in the country.  You think

10    he's a risk of flight.  That's what I've heard.

11         Now, again, my job is to come up with the least

12    onerous risk bail arrangements to ensure that he's not going

13    to leave and that he will appear before the Court to answer to

14    the charges and that he's not a danger to the community.

15    Danger to the community is off the table.  We haven't heard a

16    word about it, so now it's really what's the least onerous

17    conditions I can set to ensure that he will appear for his

18    serious federal charges.

19         I believe that combining a substantial bail package.

20    I do take what you say to heart that there were offshore

21    accounts that he may not have disclosed, so I'm going to up

22    the amount of the bail package that people will be asked to

23    sign on.  Then what I would normally say under the

24    circumstances as set forth in this criminal matter, but I do

25    believe once he's situated we can get an electronic monitoring

27

1   with a land line, whichever place he's situated, whether he

2   takes a job in D.C., Georgia, Illinois.  He could get a land

3   line and we could monitor it.

4           I think that what I heard, even though it was

5   whispered, is since he's just hearing that he's not getting

6   the job that he thought he had when he started this

7   application.  He's going to need a chance to set things up for

8   himself.  If it's not him coming back to Kuwait to oversee the

9   move, so be it.  I understand that.  He won't be able to go

10  out of the country to move his things back.  He's going to

11  have to trust that somebody else can oversee that.

12          But insofar as he didn't know that he wasn't going

13  to the Dobbins Air Force Base until you started speaking, he

14  should be given a chance to figure out what his next move is.

15          MR. HELLER:  Your Honor, I just want to mention that

16  when we interviewed him in the lockup his first statement is

17  "Mr. Heller, I have to get to my job at the Air Force by such

18  and such a date" --

19          THE COURT:  Well, again, you're going to have to --

20          MR. HELLER:  -- so he didn't know that -- he's

21  shocked now to learn that he may not have his job.  I just

22  want the Court to be --

23          THE COURT:  Well, I don't think he should be so

24  shocked.

25          MR. HELLER:  Okay.

28

1          THE COURT:  Because what he's being charged with in

2    addition to whatever you know about is that there has been

3    pilfering from --

4          MR. HELLER:  All right.  Well --

5          THE COURT:  -- accounts.  Again, it doesn't mean to

6    mean that they know everything.

7          MR. HELLER:  I gotcha.

8          THE COURT:  Because there's miscommunications that

9    go on between all sorts of different divisions and arms of the

10   Government, so I take what they say to be true.  But, of

11   course, your client is going to have to look into it and see

12   what his situation is and see what his next move will be.

13          I'm going to accept this bond in the amount of

14   $500,000.00.  I'm going to have his wife, his brother that's

15   in court, and the brother who lives in the other jurisdiction

16   sign.  I'm going to ask that if there are people still packing

17   him up at his residence that they look for the passports

18   because that's a positive concern to the Government and they

19   would feel more stable if they had both the Ghanian and the

20   United States passport.  Since he says that's where they were

21   left in the residence, they'd have to be packed up, his wife

22   is raising her hand, so you might want to look back to her.

23          MR. HELLER:  Can I leave the bench for a second --

24          THE COURT:  yes.

25          MR. HELLER:  -- and just see what she has to say?

29

1        MS. ALBRECHT:  Your Honor, I know that the Court

2   hasn't been interested, but we're going to [inaudible] relief

3   from stay.

4        THE COURT:  I said I would stay it.  I didn't have a

5   problem with that.  I already said I would stay it.

6        MR. HELLER:  Your Honor, the wife has just indicated

7   that to comfort the Court and U.S. Attorney's Office she will

8   return to Kuwait.  She will access I guess their private vault

9   or locked desk or whatever it is.  She will get his passport,

10  the one that they're concerned about, although we're

11  substituting the issue with the monitoring, but she will come

12  back.  She'll give it to us and I'll deliver it to the U.S.

13  attorneys.

14       THE COURT:  Well, that's fine, Mr. Heller.  I'm sure

15  that they would both say that they would feel better if it

16  wasn't his wife leaving the country because she's part of the

17  [inaudible] suasion, and their two young kids are three and

18  four, and they certainly don't want the wife and the young

19  kids leaving the country because that's --

20       MR. HELLER:  All right.

21       THE COURT:  -- probably putting them more in doubt.

22  I don't know who else you have over there.  That's not the

23  Court's issue.

24       MR. HELLER:  All right.  We'll address it later.

25       THE COURT:  That's not the Court's issue, but you

30

have to understand.  If they think he's going to flee, having

his wife and children here is more of an incentive to stay

than if his wife and children are in a foreign land.

        MR. HELLER:  We'll facilitate that, Judge.  We'll

have the wife stay here.

        THE COURT:  I don't need to be involved in that.

        MR. HELLER:  Okay.  I gotcha.

        THE COURT:  They're appealing whatever decision I --

        MR. HELLER:  I understand.  All right.

        THE COURT:  -- enter.  I don't govern.  What his

wife does.

        MR. HELLER:  I gotcha.

        THE COURT:  I only have power over this man and

whether he's detained or he's released, so the conditions that

I was setting, which I was halfway through when we got off

track, $500,000.00.  The brother and wife that are here today,

the brother that lives in wherever it is, Ohio, the house,

with the confession of judgment in whatever county it is on

the house, and yes, best efforts to get the passports and

electronic monitoring at whichever residence it is where he

does intend to be.  We can revisit that because if he doesn't

have the job at Dobbins, I don't want him not to be able to

get a job.  He had possibilities of two jobs before you opened

your mouth for this bail hearing.  He had the Department of

State possibility and he had Dobbins already in hand.  Now he

31

1  thinks he has neither.

2          I'm not going to make him not look for a job.  I'll

3  set it up so that wherever he's going to be monitored he'll

4  have electronic monitoring, but he will be able to look and

5  get employment.  If he gets employment, we're going to put him

6  on a curfew where the hours that he's working he gets to work

7  and that the hours that he will be at home there can be

8  monitoring.

9          MS. ALBRECHT:  Your Honor, this is [inaudible] gets

10  to Washington assuming that he -- the report doesn't overturn

11  your decision and then they'll come up with their own bail

12  package because --

13          THE COURT:  Oftentimes, the courts uphold the lower

14  court or the removal court's decision if the person appears,

15  which is why I wanted you to find out when he was supposed to

16  appear.  If the bail condition set got him to appear, they can

17  rely on the bail conditions set.  Where he's going to be is

18  the big question mark, whether or not he's going to be at

19  Dobbins or in Washington, D.C., but I'm saying wherever he can

20  set up shop he can be electronically monitored by the Pretrial

21  Service office of the local district court.

22          Yes, I will stay this after I get the signatures so

23  that they don't have to come back if they're not current.

24  You'd have to get the signature of whoever is in Ohio.  Then

25  I'll give you the 24 hours to appeal and we'll put it back on

32

1  the calendar for whatever is the date after that.  I

2  understand guess it's Friday.

3          MR. HELLER:  We're going to set this down for

4  Friday?

5          THE COURT:  Well, he can't be released today because

6  we have to get the brother's signature in Ohio.

7          MR. HELLER:  Right.

8          THE COURT:  The confession of judgment can be filed

9  within seven days of the brother signing.

10         MR. HELLER:  But tomorrow would be too premature.

11         THE COURT:  Well --

12         MR. HELLER:  Can we set it --

13         THE COURT:  We could do it -- if you think you could

14  get to the D.C. court.  It's now --

15         MR. HELLER:  We can --

16         THE COURT:  -- 3:20.  It's possible that you could

17  get them to consider this.  Either they're going to uphold it

18  or they'll overrule it.

19         MR. HELLER:  Maybe we can get a late hour for

20  tomorrow to come back to court.

21         THE COURT:  We can only tell them to put them on the

22  bus for 2:00, but you can plan to be here a little bit after

23  3:00.  How's that [inaudible] --

24         MR. HELLER:  Is that for tomorrow, Judge?  Good.

25         MS. ALBRECHT:  It's my understanding that the D.C.

33

1  court has to make its decision before he can be presented

2  again.

3          THE COURT:  No.  Before his release they have to

4  make a decision, but usually a bail determination is made

5  quickly.

6          MS. ALBRECHT:  Right.  Right.  And we're going to

7  file our appeal immediately.

8          THE COURT:  You can -- that's fine.

9          MS. ALBRECHT:  Hopefully we'll have an answer, but I

10  don't think unless --

11          THE COURT:  Well, let's have him brought back

12  tomorrow, too.

13          MR. HELLER:  Thank you for your courtesy and your

14  patience to it.

15          THE COURT:  Well, again, I still need the sureters

16  to come forward, Mr. Heller.

17          MR. HELLER:  Right.

18          THE COURT:  We're not going to get the brother's

19  signature in Ohio unless we fax this bond to him, so I'm going

20  to set that in motion.

21          MR. HELLER:  Good.

22          THE COURT:  Have you contact his brother and have

23  you -- this bond faxed.  If it's a waste of his time and

24  effort because the appeal succeeds --

25          MR. HELLER:  So what?  Right.  I agree.

34

1        THE COURT:  -- so be it.  Okay?

2        MR. HELLER:  We'll stay on that side of the Court --

3        THE COURT:  No, you can't go anywhere --

4        MR. HELLER:  Oh.

5        THE COURT:  -- yet.

6        MR. HELLER:  Okay.

7        THE COURT:  I need Ms. Saani and the brother to come

8   forward to sign the bond.

9        THE DEFENDANT:  I just want to make sure it's

10  spelled right.

11       THE COURT:  And the lawyers need to get out of their

12  way so that I can speak to the sureters.

13       MR. HELLER:  The lawyers are always in the way.

14       THE COURT:  Yes.  That's --

15       THE CLERK:  I was just going to ask you both some

16  questions.  Okay?  So I need to swear you in.  Please raise

17  your right hand.

18       (Barbara Saani and Salihu Saani, sureters for the

19  defendant are sworn.)

20       THE CLERK:  Yes?

21       THE DEFENDANT:  Yes.

22       THE CLERK:  Thank you.  Please speak up.  It's being

23  recorded.  Your name for the record, please?

24       MS. SAANI:  Barbara [Ph.] Saani.

25       THE CLERK:  Thank you.  And sir?

35

1          MR. S. SAANI:  Salihu Saani.

2          THE CLERK:  Okay.  Spell it, Salihu.

3          MR. S. SAANI:  S-a-l-i-h-u.

4          THE CLERK:  l-i-h-u.  And Saani?

5          MR. S. SAANI:  Saani.  Yeah.

6          THE CLERK:  Okay.  Thank you very much.

7          THE COURT:  Mr. Saani and Mrs. Saani, I'm sorry for

8    the circumstances that bring you to the courthouse today.

9          As you understand, your husband -- I guess it's your

10   brother has been charged with a serious federal crime in the

11   District of Columbia.  The Government is making the argument

12   that he should not be released and he should be held pending

13   this trial on these charges.

14         As you've heard, I have set a bond in the amount of

15   $500,000.00 secured by your signatures, as well as Mr. Saani's

16   brother out in Ohio.  Mr. Saani's brother will also file

17   papers for his house that he has in Ohio.  What this means is

18   if the District Court in Columbia does not overturn my

19   decision, then Mr. Saani can be released on the conditions

20   that I set, which as you've heard include besides the money

21   that he will be monitored by Pretrial Services, that as soon

22   as you're able to you can surrender the passports that are in

23   a locked safe in Kuwait, that he will not travel outside the

24   country, although I can't set geographic location now because

25   I don't know where you're going to live yet, that when he is

36

1 at home he will be monitored electronically by a bracelet

2 around his leg, which would show if he tried to flee because

3 it would set off a signal.

4        If for any reason Mr. Saani does not come back to

5 court when he is directed to do so, there would be agents

6 dispatched, he would be placed under arrest, he would be

7 brought back to court.  The likelihood is he would not be

8 released again pending the trial on the charges, but in

9 addition you and the brother out in Ohio, all three of you

10 would be on the hook to the United States Government for the

11 full amount of this bond, which is $500,000.00.  They would be

12 able to get this money from any bank account he had or any --

13 from any property you own, from any wages that you earn.  They

14 would be able to intercept any money that was due to you,

15 garnished the wages.  Mr. Saani?

16        MR. S. SAANI:  Yes, ma'am.

17        THE COURT:  I've already been told that Mrs. Saani

18 does not work outside the home, so I can't ask her that

19 question.  I'm sure you work plenty hard with a three and a

20 four-year-old at home.

21        Where do you work, sir?

22        MR. S. SAANI:  I work for Sygma Network in Columbus,

23 Ohio.

24        THE COURT:  What is the name?

25        MR. S. SAANI:  Sygma.  Sygma.

37

```
 1            THE COURT:  Sygma.  S-y?
 2            MR. S. SAANI:  Yeah.  Yeah, [inaudible].
 3            THE COURT:  Okay.
 4            MR. S. SAANI:  Yeah.
 5            THE COURT:  Very good.  How long have you worked
 6  there, sir?
 7            MR. S. SAANI:  Be six years now.
 8            THE COURT:  And what do you do for them?
 9            MR. S. SAANI:  I drive for them.
10            THE COURT:  You drive?
11            MR. S. SAANI:  Yeah, as a truck driver, yes.
12            THE COURT:  Okay.  And how much did you earn
13  approximately?
14            MR. S. SAANI:  About $65,000.00.
15            THE COURT:  You understand that having a $500,000.00
16  judgment by the United States Government, which they could go
17  after you for for the rest of your life would be a big hole to
18  crawl out of financially?
19            MR. S. SAANI:  Yes, ma'am.  I understand.
20            THE COURT:  You would not be able to get a bank
21  loan, a credit card, a mortgage.  You understand?
22            MR. S. SAANI:  I understand that.
23            THE COURT:  Is he your older or younger brother?
24            MR. S. SAANI:  That's my older brother.
25            THE COURT:  Okay.  Have you ever had to get him out
```

38

1  of trouble before?

2          MR. S. SAANI:  No.

3          THE COURT:  Okay.  I'm not going to ask you any of

4  these questions.  I'm just going to ask -- I had to tell you

5  this to make sure that you understand that signing this,

6  although there's nothing today more than signing, that it does

7  come with consequences if for any reason Mr. Saani does not

8  appear when he's directed to appear.  Do you understand,

9  Mr. Saani?

10          MR. S. SAANI:  Yes.

11          THE COURT:  Do you want to sign this?  Okay.

12  Ms. Yuen, we need you back because they both need to sign.

13  Thank you.

14          THE CLERK:  Yes.

15          THE COURT:  Thank you.

16          THE CLERK:  Barbara, sign on top of your name and

17  your residence here.

18          THE COURT:  I want to make on the record the

19  statement that it seems that Mr. Saani's brother traveled in

20  from Ohio in order to sign this bond.  Again, the Court is

21  confident that they understand the nature of the obligations

22  of the bond and the Court finds them both to be credible

23  sureters.

24          Mrs. Saani, do you know where the brother who lives

25  in Ohio -- is it Columbus?

39

1          MRS. SAANI:  Yes, it is.

2          THE COURT:  We're going to have to fax the bond to

3     the Court.  There may be one in Columbus.  I don't know.  The

4     closest district court there is -- he'd have to go there

5     before a judge to sign.  Okay.  The lawyers will fill you in

6     on anything else that you need to be filled in on, but the

7     Court here will only take care of faxing it to the local

8     court.  That's all we can do, okay?

9          MRS. SAANI:  Thank you.

10          THE COURT:  Thank you both very much.  You may be

11     seated.

12          MR. S. SAANI:  Thank you.

13          THE COURT:  As far as this proceeding, I have told

14     the Government that I will stay having Mr. Saani sign and

15     having the Court release him.  Is that what I should do, Sumae

16     [Ph.] or I sign --

17          THE CLERK:  I'm sorry.  What was the question?

18          THE COURT:  Do I sign the bond for him to be

19     released if they want to appeal or do I stay it on the record

20     after I sign?  I sign it, huh?

21          THE CLERK:  I guess it's up to you, Judge.  It

22     depends on whether you want it --

23          THE COURT:  Well, I would --

24          THE CLERK:  The sureters [inaudible] --

25          THE COURT:  -- usually wait for the third sureter to

40

1  sign, but you can appeal that this is the bond that's

2  intended.  I'm waiting for the third sureter.  Then I'll give

3  him his bail warnings and have his signature taken at the time

4  after you appeal the conditions already set.

5            THE CLERK:  Right.  Our filing doesn't indicate

6  whether [inaudible].

7            MR. HELLER:  Your Honor, is your aide going to fax

8  that document for signature to the other brother?

9            THE COURT:  Yes.

10            THE CLERK:  Yes.

11            MR. HELLER:  Have --

12            THE CLERK:  It's [inaudible].

13            MR. HELLER:  Have resecured before we get broken up

14  to save time do we have his -- the fax number?

15            THE COURT:  It's not to him.  It's to the Court.  He

16  has to go and present himself before a magistrate judge to

17  sign a bond.

18            MR. HELLER:  Okay.  You'll give us instructions

19  then.  Okay.

20            THE CLERK:  Yeah.

21            THE COURT:  Well, we'll go around to the office.

22  They can't leave my side.

23            MR. HELLER:  I got you, Judge.

24            THE COURT:  They're indispensable, okay?

25            MR. HELLER:  Okay.

41

1          THE COURT:  Was there anything else that needed to

2  be addressed by the Government?  I am staying this, but I am

3  having Mr. Saani brought back to court tomorrow.  If it's too

4  late for you to do the order, I'm asking that the marshals

5  make sure that he be placed on a bus.  Is that a problem,

6  marshals?

7          THE MARSHAL:  No problem.

8          THE COURT:  Thank you.  Okay.  So this will be

9  stayed pending your appeal to the D.C. court and we'll see you

10 tomorrow.  Thank you very much.

11          MS. BRICKLEY:  Thank you, Your Honor.

12          MR. HELLER:  Thank you, Judge.

13          (Proceedings concluded at 3:33 p.m.)

14                    *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

42

1        I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5

6                           _____

7                                     Ruth Ann Hager

8   Dated:   May 27, 2008

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## AFFIDAVIT OF TITLE

STATE OF ILLINOIS )
                ) SS
COUNTY OF COOK    )

      The undersigned affiant, being first duly sworn, on oath says, and also covenants with and warrants to the grantee hereinafter named:

      That affiant has an interest in the premises described below or in the proceeds thereof or is the grantor in the deed dated September 30, 2002, to grantee, TIJANI SAANI and BARBARA SAANI, husband and wife, conveying the following described premises:

      Lot 88 in Ballantrae of Flossmoor Unit 3 being a Subdivision of part of the Northwest 1/4 and Southwest 1/4 of Section 11, Township 35 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois

      COMMONLY KNOWN AS: 1442 Kinross, Flossmoor, IL 60422

      That no labor material has been furnished for the premises within the last four months that is not fully paid for.

      That since the title date of September 13, 2002, in the report on title issued by LAW OFFICES OF D. JAMES BADER, P.C., affiant has not done or suffered to be done anything that could in any way affect the title to the premises, and no proceedings have been filed by or against affiant, nor has any judgment or decree been rendered against affiant, nor is there any judgment note or other instrument that can result in a judgment or decree against affiant within five days from the date hereof.

      That all water taxes, except the current bill, have been paid, and that all the insurance policies assigned have been paid for.

      That this instrument is made to induce, and in consideration of, the said grantee's consummation of the purchase of the premises.

      Affiant further states: nothing.

                    STEVEN W. REICHERT HOMES, L.L.C.

Subscribed and sworn to
before me this *1st* day
of October, 2002.

                    By: _____ (SEAL)
                    William J. Reichert, Manager

Notary Public

OFFICIAL SEAL
OLDIE MANKIN
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. AUG. 27,2005

CT JB83Y9107
1082

## *Trustee's Deed*

This indenture made this 30th day
of September, 2002, between
FIFTH THIRD BANK,
(CHICAGO), as successor to
Grand Premier Trust and
Investment, Inc., N.A., Trustee
under the provisions of a deed or
deeds in trust, duly recorded and
delivered in pursuance of a trust agreement dated the 29th day of December, 1999, and known as Trust #2004015,
party of the first part, and Tijani Saani and Barbara Saani, party of the second part, *as joint tenants with right of survivorship and not as tenants in common*

Address of Grantee(s):  American Embassy, Kuwait

Witnesseth, that said party of the first part, in consideration of the sum of Ten ($10.00) dollars, and other good and
valuable considerations in hand paid, does hereby Convey and Quit-Claim unto said parties of the second part, the
following described real estate, situated in Cook County, Illinois, to-wit:

> LOT 88 IN BALLANTRAE OF FLOSSMOOR, UNIT 3, BEING A SUBDIVISION OF PART OF THE NORTHWEST ¼
> AND SOUTHWEST ¼ OF SECTION 11, TOWNSHIP 35 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL
> MERIDIAN, IN COOK COUNTY, ILLINOIS.
>
> SUBJECT TO:  Building lines and building laws and ordinances; use or occupancy restrictions, conditions and covenants of
> record; zoning laws and ordinances; public and utility easements; public roads and highways, if any; general real estate taxes
> for the year 2001 and subsequent years.

ADDRESS:  1442 Kinross, Flossmoor, IL  60422
PIN #:      31-11-109-007

TO HAVE AND TO HOLD the same unto said parties of the second part, and to the proper use, benefit and behoof
forever of said parties of the second part.

This deed is executed pursuant to and in the exercise of the power and authority granted to and vested in said trustee
by the terms of said deed or deeds in trust delivered to said trustee in pursuance of the trust agreement above
mentioned.  This deed is made subject to the lien of every trust deed or mortgage (if any there be) of record in said
county given to secure the payment of money, and remaining unreleased at the date of the delivery hereof.

IN WITNESS WHEREOF, said party of the first part has caused its name to be signed to these presents by its Land
Trust Officer and attested by its Authorized Signer, the day and year first above written.

FIFTH THIRD BANK, (CHICAGO), as Trustee as Aforesaid

By  K. A. Baker
Land Trust Officer

Attest:

By:
Authorized Signer

SUMMARY REPORT OF A COMPLETE APPRAISAL

# UNIFORM RESIDENTIAL APPRAISAL REPORT

File No. 02070026

**Property Description**

| Property Address 1442 KINROSS ST | City FLOSSMOOR | State IL | Zip Code 60422 |
|---|---|---|---|

Legal Description SEE TITLE POLICY — County COOK

Assessor's Parcel No. NOT ASSIGNED NEW CONSTRUCTION — Tax Year 2000 — R.E. Taxes $ 8500 EST — Special Assessments $ NONE REPR'

Borrower N/A — Current Owner REICHERT BUILDERS — Occupant: ☐ Owner ☐ Tenant ☒ Vacant

Property rights appraised ☒ Fee Simple ☐ Leasehold — Project Type ☐ PUD ☐ Condominium (HUD/VA only) — HOA$ 16.08 /Mo.

Neighborhood or Project Name BALLANTRAE — Map Reference SMSA 1600 — Census Tract 8299.02

Sale Price $ EST.MKT.VAL. Date of Sale INSPT. 07/02 Description and $ amount of loan charges/concessions to be paid by seller N/A

Lender/Client TIJANI SAANI — Address

Appraiser MARC BROWN — Address 10121 BUELL CT., OAK LAWN, IL 60453

| Location | ☐ Urban ☒ Suburban ☐ Rural | Predominant occupancy | Single family housing | | Present land use % | Land use change |
|---|---|---|---|---|---|---|
| | | | PRICE $(000) | AGE (yrs) | One family 95% | ☒ Not likely ☐ Likely |
| Built up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | | 2-4 family | ☐ In process |
| Growth rate | ☐ Rapid ☒ Stable ☐ Slow | ☒ Owner | 350 Low | N.C. | Multi-family | To: |
| Property values | ☒ Increasing ☐ Stable ☐ Declining | ☐ Tenant | 600 High | 5 | Commercial 5% | |
| Demand/supply | ☐ Shortage ☒ In balance ☐ Over supply | ☒ Vacant (0-5%) | Predominant | | | |
| Marketing time | ☐ Under 3 mos. ☒ 3-6 mos. ☐ Over 6 mos. | ☐ Vacant (over 5%) | 425 | 2 | | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: THE NEIGHBORHOOD BOUNDARIES ARE FLOSSMOOR RD ON THE NORTH, VOLLMER ROAD TO THE SOUTH, CENTRAL PARK TO THE EAST AND CRAWFORD AVE. TO THE WEST.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.): THE SUBJECT IS LOCATED IN THE MIDDLE SECTION OF BALLANTRAE A DEVELOPING SUBDIVISION IN FLOSSMOOR. THE AREA IS COMPRISED MAINLY OF 2700-4000 S.F. SEMI-CUSTOM 2-STORY STYLE HOUSES NEW-5 YEARS OLD. NECESSARY SUPPORTING FACILITIES INCLUDING SCHOOLS, SHOPPING, RECREATION AND EMPLOYMENT ARE LOCATED WITHIN A ONE MILE RADIUS. LEVELS OF EXTERNAL MAINTENANCE APPEAL AND MARKETABILITY ARE CONSIDERED AVERAGE.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the neighborhood, description of the prevalence of sales and financing concessions, etc.): PROPERTY VALUES ARE STABLE BASED ON PAST MARKETING TRENDS IN THE SUBJECT'S NEIGHBORHOOD, SUPPLY AND DEMAND ARE IN GENERAL BALANCE. CONVENTIONAL FINANCING IS PREVALENT. INTEREST BUYDOWNS, CONCESSIONS AND SPECIAL FINANCING ARE UNCOMMON. THE AVERAGE MARKETING TIME FOR COMPETITIVE PROPERTIES IN THIS AREA IS UNDER THREE MONTHS. THIS APPRAISAL REPORT IS PREPARED FOR THE SOLE & EXCLUSIVE USE OF TIJANI SAANI TO ASSIST WITH THE PURCHASE DECISION. IT IS NOT TO BE RELIED UPON BY ANY THIRD PARTIES FOR ANY PURPOSE, WHATSOEVER.

Project Information for PUDs (If applicable) - - Is the developer/builder in control of the Home Owners' Association (HOA)? ☐ YES ☐ NO

Approximate total number of units in the subject project N/A — Approximate total number of units for sale in the subject project N/A

Describe common elements and recreational facilities: N/A

| Dimensions 90 X 158.6 X 108 X 158, FROM REALTOR, SUBJECT TO SURVEY | Topography | BASICALLY LEVEL |
|---|---|---|
| Site area 15672 SQ.FT. +/- Corner Lot ☐ Yes ☒ No | Size | TYPICAL FOR AREA |
| Specific zoning classification and description R-1 S.F. RESIDENTIAL DISTRICT | Shape | RECTANGULAR |
| Zoning compliance ☒ Legal ☐ Legal nonconforming (Grandfathered use) ☐ Illegal ☐ No zoning | Drainage | APPEARS ADEQUATE |
| Highest & best use as improved: ☒ Present use ☐ Other use (explain) | View | AVERAGE |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | Landscaping | SODDED |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Street | ASPHALT | ☒ | | Driveway Surface | CONCRETE |
| Gas | ☒ | | Curb/gutter | CONCRETE | ☒ | | Apparent easements | NONE NOTED |
| Water | ☒ | | Sidewalk | CONCRETE | ☒ | | FEMA Special Flood Hazard Area ☐ Yes ☒ No | |
| Sanitary sewer | ☒ | | Street lights | OVERHEAD | ☒ | | FEMA Zone X | Map Date 11/06/00 |
| Storm sewer | ☒ | | Alley | NONE/TYPICAL* | | | FEMA Map No. 17031C 0737 F | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning, use, etc.): THERE WERE NO APPARENT ADVERSE EASEMENTS OR ENCROACHMENTS. THE SITE DISPLAYS ADEQUATE MAINTENANCE. *NO EFFECT ON EITHER VALUE OR MARKETABILITY.

| GENERAL DESCRIPTION | EXTERIOR DESCRIPTION | FOUNDATION | BASEMENT | INSULATION |
|---|---|---|---|---|
| No. of Units ONE | Foundation CONCRETE | Slab NO | Area Sq.Ft. 1717 | Roof CNCLD ☒ |
| No. of Stories 2 LEVELS | Exterior Walls BRICK/DRIVIT | Crawl Space NO | % Finished 0 | Ceiling CNCLD ☒ |
| Type (Det./Att.) DET. | Roof Surface ASPH.SHGL. | Basement FULL | Ceiling JOISTS | Walls CNCLD ☒ |
| Design (Style) 2-STORY | Gutters & Dwnspts. ALUMINUM | Sump Pump YES | Walls CONCRETE | Floor CNCLD ☒ |
| Existing/Proposed EXIST. | Window Type VINYL D. H. | Dampness NONE NOTED | Floor CONCRETE | None ☐ |
| Age (Yrs.) NEW | Storm/Screens YES | Settlement NONE NOTED | Outside Entry NO | Unknown ☐ |
| Effective Age (Yrs.) NEW | Manufactured House NO | Infestation NONE NOTED | | |

| ROOMS | Foyer | Living | Dining | Kitchen | Den | Family Rm. | Rec. Rm. | Bedrooms | # Baths | Laundry | Other | Area Sq.Ft. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Basement | | | | | | | | | | | | 1,717 |
| Level 1 | 1 | 1 | 1 | 1 | | 1 | | 1 | .5 | X | SITTING | 1,717 |
| Level 2 | | | | | | | | 3 | 2 | | | 1,363 |
| | | | | | | | | | | | | 0 |

Finished area above grade contains: 9 Rooms; 4 Bedroom(s); 2.5 Bath(s); 3,080 Square Feet of Gross Living Area

| INTERIOR | Materials/Condition | HEATING | | KITCHEN EQUIP. | | ATTIC | | AMENITIES | | CAR STORAGE: | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floors | CARP/CERAM/GD. | Type | 2-FA | Refrigerator | ☐ | None | ☐ | Fireplace(s) # F.R. | ☒ | None | ☐ |
| Walls | DRYWALL/GOOD | Fuel | GAS | Range/Oven | ☒ | Stairs | ☐ | Patio CONC. | ☒ | Garage THREE # of cars | |
| Trim/Finish | WOOD/GOOD | Condition NEW | | Disposal | ☒ | Drop Stair | ☐ | Deck | ☐ | Attached | ☐ |
| Bath Floor | CERAMIC/GOOD | COOLING | | Dishwasher | ☒ | Scuttle | ☒ | Porch COVRD. | ☐ | Detached | ☐ |
| Bath Wainscot | CERAMIC/GOOD | Central YES-2 | | Fan/Hood | ☒ | Floor | ☐ | Fence | ☐ | Built-In | 3 |
| Doors | 6.PNL.OAK/GOOD | Other E.FILTR | | Microwave | ☒ | Heated | ☐ | Pool | ☐ | Carport | ☐ |
| | | Condition NEW | | Washer/Dryer | ☐ | Finished | ☐ | MBR. BALCONY | ☒ | Driveway | 3 |

Additional features (special energy efficient items, etc.): See Attached Addendum.

Condition of the improvements, depreciation (physical, functional, and external), repairs needed, quality of construction remodeling/additions, etc.: THE SUBJECT IS IN GOOD CONDITION. PHYSICAL DEPRECIATION IS DUE TO NORMAL WEAR AND TEAR. THE WAS NO FUNCTIONAL OR EXTERNAL OBSOLESCENCE OBSERVED.

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: THERE ARE NO KNOWN OR APPARENT ADVERSE ENVIRONMENTAL CONDITIONS THAT WOULD EFFECT VALUE OR MARKETABILITY.

Freddie Mac Form 70 6-93 — PAGE 1 OF 2 — Fannie Mae Form 1004 6-93

This form was produced on the ACI Development RapidForms system (800)234-8727

SUMMARY REPORT OF A COMPLETE APPRAISAL

## UNIFORM RESIDENTIAL APPRAISAL REPORT

**Valuation Section**   File No. 02070026

### COST APPROACH

| | | |
|---|---|---|
| ESTIMATED SITE VALUE | = $ | 75,000 |
| ESTIMATED REPRODUCTION COST-NEW OF IMPROVEMENTS: | | |
| Dwelling 3,080 Sq. Ft. @ $ 92.85 = $ | | 285,978 |
| BSMT. 1717 Sq. Ft. @ $ 17.00 = $ | | 29,189 |
| EXTRAS ABOVE | | |
| Garage/Carport 803 Sq. Ft. @ $ 21.59 = $ | | 17,337 |
| Total Estimated Cost New | = $ | 332,504 |
| Less Physical / Functional / External Est. Remaining Econ. Life: 50 | | |
| Depreciation | = $ | 0 |
| Depreciated Value of Improvements | = $ | 332,504 |
| "As-is" Value of Site Improvements | = $ | 4,000 |
| INDICATED VALUE BY COST APPROACH ROUNDED | = $ | 411,500 |

Comments on Cost Approach (such as, source of cost estimate, site value, square foot calculation and for HUD, VA and FmHA, the estimated remaining economic life of the property):
SEE ATTACHED SKETCH ADDENDUM FOR BUILDING SKETCH AND GROSS ABOVE GRADE LIVING AREA CALCULATIONS. THE MARSHALL & SWIFT RESIDENTIAL COST HANDBOOK WAS USED IN ESTIMATING THE REPRODUCTION COST NEW OF THE IMPROVEMENTS. PHYSICAL DEPRECIATION IS BASED ON THE AGE/LIFE METHOD. THE ESTIMATED REMAINING ECONOMIC LIFE IS 75YEARS.

### SALES COMPARISON ANALYSIS

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 1442 KINROSS ST FLOSSMOOR | 1633 BERWICK CT FLOSSMOOR | | 3706 CULLODEN FLOSSMOOR | | 3914 BALLANTRAE WAY FLOSSMOOR | |
| Proximity to Subject | | 3 BLOCKS | | 2 BLOCKS | | 2.5 BLOCKS | |
| Sales Price | $ EST.MKT.VAL | $ | 420,000 | $ | 379,900 | $ | 347,000 |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 136.36 ☑ | | $ 135.34 ☑ | | $ 139.64 ☑ | |
| Data and/or Verification Sources | EXT.INSPECTION/MLS ASSESSOR/MLS | EXT.INSPECTION/MLS REALTOR RE:BUILDER | | EXT.INSPECTION/MLS ASSESSOR'S RECORDS | | EXT.INSPECTION/MLS ASSESSOR'S RECORDS | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sales or Financing Concessions | | CONVENTIONAL NO CONCESS. | | CONVENTIONAL NO CONCESS. | | CONVENTIONAL NO CONCESS. | |
| Date of Sale/Time | INSPT. 6/7/02 | 06/20/02 | | 08/29/01 | | 10/03/01 | |
| Location | GOOD | GOOD | | GOOD | | GOOD | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 15672 S.F.+ | CUL-DE-SAC | -10,000 | CUL-DE-SAC | -10,000 | POND VIEW | -15,000 |
| View | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Design and Appeal | 2-STORY | 2-STORY | | 2-STORY | | 2-STORY | |
| Quality of Construction | BRICK/DRIVIT | BRICK/DRIVIT | | BRICK/DRIVIT | | BRICK/CEDAR | EQUAL |
| Age | NEW | NEW | | 5 YEARS | 20,000 | 5 YEARS | 20,000 |
| Condition | GOOD | GOOD | | GOOD | | GOOD | |
| Above Grade Room Count | Total 9 / Bdrms 4 / Baths 2.50 | Total 9 / Bdrms 4 / Baths 2.50 | | Total 9 / Bdrms 4 / Baths 2.50 | | Total 9 / Bdrms 4 / Baths 2.50 | |
| Gross Living Area | 3,080 Sq.Ft. | 3,080 Sq.Ft. | 0 | 2,807 Sq.Ft. | 27,300 | 2,485 Sq.Ft. | 59,500 |
| Basement & Finished Rooms Below Grade | FULL UNFINISHED | FULL UNFINISHED | | PARTIAL UNFINISHED | 7,500 | FULL UNFINISHED | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | 2-FA C/AIR | 2-FA C/AIR | | 2-FA C/AIR | | 2-FA C/AIR | |
| Energy Efficient Items | TYPICAL | TYPICAL | | TYPICAL | | TYPICAL | |
| Garage/Carport | 3 CAR GARAGE | 3 CAR GARAGE | | 3 CAR GARAGE | | 3 CAR GARAGE | |
| Porch, Patio, Deck, Fireplace(s), etc. | C.PORCH,PATIO 1 FIREPLACE | C.PORCH,PATIO 1 FIREPLACE | | PATIO 1 FIREPLACE | 3,500 | PATIO 1 FIREPLACE | 3,500 |
| Fence, Pool, etc. | MBR. BALCONY | NONE | 2,500 | NONE | 2,500 | MBR. BALCONY | |
| UPGRADES | AVERAGE | GRANITE C.TOPS | -5,000 | GOOD | -20,000 | AVERAGE | |
| Net Adj. (total) | | [ ] + [X] - $ | 12,500 | [X] + [ ] - $ | 30,800 | [X] + [ ] - $ | 68,000 |
| Adjusted Sales Price of Comparable | | Gross: 4.2% Net: -3.0% $ | 407,500 | Gross: 23.9% Net: 8.1% $ | 410,700 | Gross: 28.2% Net: 19.6% $ | 415,000 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.): See Attached Addendum.

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | NONE 1 YEAR N/A | NONE 1 YEAR N/A | NONE 1 YEAR N/A | NONE 1 YEAR N/A |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:
PRIOR SALES OF SOME COMPARABLE PROPERTIES OCCURED MORE THAN ONE YEAR AGO. THE SUBJECT IS NEW CONSTRUCTION & HAS BEEN OFFERED FOR SALE FOR $419,900.

| | | |
|---|---|---|
| INDICATED VALUE BY SALES COMPARISON APPROACH | | 407,500 |
| INDICATED VALUE BY INCOME APPROACH (If Applicable) Estimated Market Rent $ N/A /Mo. x Gross Rent Multiplier N/A = $ | | N/A |

### RECONCILIATION

This appraisal is made [ ] "as is" [ ] subject to the repairs, alterations, inspections or conditions listed below [X] subject to completion per plans and specifications.
Conditions of Appraisal: PERSONAL PROPERTY (APPLIANCES ETC.) HAS NOT BEEN INCLUDED IN THE VALUATION OF THE SUBJECT PROPERTY.
Final Reconciliation: THE FINAL ESTIMATE OF VALUE IS PREDICATED UPON THE SALES COMPARISON APPROACH AND IS SUPPORTED BY THE COST APPROACH. THE INCOME APPROACH HAS BEEN EXCLUDED DUE TO A LACK OF RENTALS AND VERIFIABLE INCOME DATA IN THIS MARKET.

The purpose of this appraisal is to estimate the market value of the real property that is the subject of this report, based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised 6/93 ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE REAL PROPERTY THAT IS THE SUBJECT OF THIS REPORT, AS OF 07/25/2002 (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ 407,500

| APPRAISER: | SUPERVISORY APPRAISER (ONLY IF REQUIRED): |
|---|---|
| Signature | Signature [ ] Did [ ] Did Not |
| Name MARC BROWN | Name Inspect Property |
| Date Report Signed 07/26/2002 | Date Report Signed |
| State Certification # 156-000113 State IL | State Certification # State |
| Or State License # State | Or State License # State |

Freddie Mac Form 70  6-93

PAGE 2 OF 2

Fannie Mae Form 1004  6-93

This form was produced by the ACI Development RealsForms system (800)234-8727

Research Associates

SUMMARY REPORT OF A COMPLETE APPRAISAL

## UNIFORM RESIDENTIAL APPRAISAL REPORT

**Supplemental Valuation Section**                                    File No. 02070026

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| | 1442 KINROSS ST | 1433 LANARK | | | | | |
| Address FLOSSMOOR | | FLOSSMOOR | | | | | |
| Proximity to Subject | | BACKS TO SUBJECT | | | | | |
| Sales Price | $ EST.MKT.VAL | $ | 435,000 | $ | | $ | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 124.29 ☑ | | $ ☑ | | $ ☑ | |
| Data and/or | INT.INSPECTION | EXT.INSPECTION/MLS | | | | | |
| Verification Sources | ASSESSOR/MLS | ASSESSOR'S RECORDS | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing | | CONVENTIONAL | | | | | |
| Concessions | | NO CONCESS. | | | | | |
| Date of Sale/Time | INSPT. 07/02 | 04/24/02 | | | | | |
| Location | GOOD | GOOD | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | 15672 S.F.+- | 16170 S.F.+- | EQUAL | | | | |
| View | AVERAGE | AVERAGE | | | | | |
| Design and Appeal | 2-STORY | 2-STORY | | | | | |
| Quality of Construction | BRICK/DRIVIT | BRICK/DRIVIT | | | | | |
| Age | NEW | 2 YEARS | 15,000 | | | | |
| Condition | GOOD | GOOD | | | | | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 9 4 2.50 | 10 4 3.50 | -15,000 | | | | |
| Gross Living Area | 3,080 Sq.Ft. | 3500 E Sq.Ft. | -42,000 | Sq.Ft. | | Sq.Ft. | |
| Basement & Finished | FULL | PARTIAL | 7,500 | | | | |
| Rooms Below Grade | UNFINISHED | UNFINISHED | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | | | | |
| Heating/Cooling | 2-FA C/AIR | 2-FA C/AIR | | | | | |
| Energy Efficient Items | TYPICAL | TYPICAL | | | | | |
| Garage/Carport | 3 CAR GARAGE | 3 CAR GARAGE | | | | | |
| Porch, Patio, Deck, | C.PORCH,PATIO | PATIO | 3,500 | | | | |
| Fireplace(s), etc. | 1 FIREPLACE | 1 FIREPLACE | | | | | |
| Fence, Pool, etc. | MBR. BALCONY | NONE | 2,500 | | | | |
| UPGRADES | AVERAGE | AVERAGE | | | | | |
| Net Adj. (total) | | ☐ + ☒ - | $ 28,500 | ☒ + ☐ - | $ 0 | ☒ + ☐ - | $ 0 |
| Adjusted Sales Price | | Gross: 19.7% | | Gross: 0.0% | | Gross: 0.0% | |
| of Comparable | | Net: -6.6% $ | 406,500 | Net: 0.0% $ | 0 | Net: 0.0% $ | 0 |

Comments on Sales Comparison (including the subject property's compatibility to the neighborhood, etc.):

| ITEM | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Date, Price and Data | NONE 1 YEAR | NONE 1 YEAR | | |
| Source for prior sales | N/A | N/A | | |
| within year of appraisal | | | | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:

Current Meter Reading - Nicor

■Current Meter Read Information   En Español   Contact Us   Careers   FAQs   Search   

Gas
bill
Records

## Current Meter Reading

Current Meter Reading| Enter a Meter Reading |

| Meter Number | 3932539 | | |
|---|---|---|---|
| Billing Period | 03/25/2008 to 05/23/2008 | | |
| Days in Billing Cycle | 59 | | |
| | Date | Type | Reading |
| Meter Readings | 05/23/2008 | Estimate | 8677 |
| | 03/25/2008 | Actual | 8438 |
| | Difference | | 239 |

| Meter reading schedule | | |
|---|---|---|
| **Date** | **Type** | Scheduled - Nicor Gas will attempt to read your meter the day before or up to two days after the scheduled date. |
| 06/23/2008 | Estimated | |
| 07/23/2008 | Scheduled | Estimated - Your meter reading will be estimated for this billing period. If you prefer an actual meter reading for this billing period. you can enter your meter reading online. |
| 08/21/2008 | Estimated | |
| 09/22/2008 | Scheduled | |

Change Password
Sign Out

**Account Number**
6725862304 1
**Name on Account**
Saeni,Barbara
**Meter Number**
3932539
**Service Address**
1442 Kinross St
Flossmoor, IL 60422

©2006 Nicor Inc | Terms of Use
Careers | Contact Us | FAQs | Site Map | Search | En Español

Gas Usage Table - Nicor



■Your Gas Use History

En Español    Contact Us    Careers    FAQs    Search

Change
Password
Sign Out

**Account
Number**
6725662304
1
**Name on
Account**
Saani,Barbara
**Service
Address**
1442 Kinross
St
Flossmoor, IL
60422

## Your Gas Use History

Gas Usage Table | Gas Usage Graphs |

**Current Gas Supplier:** Nicor Gas [ Full Supplier List ]

**Note:** If you have chosen an alternative supplier through Customer Select,
please contact your supplier for information about your gas usage and
costs. The Total column in the chart below shows only Nicor Gas' charge
for natural gas delivery, not your supplier's charges for the gas itself.

 Gas Usage Graphs

| Billing Period Dates (From / To) | Days in Bill | Degree Days | Therms Used | Cost per Therm $ | Therms x Cost $ | Total$ |
|---|---|---|---|---|---|---|
| 3/25/2008 to 5/23/2008 | 59 | 729 | 242.33 | 1.0625 | 257.48 | 314.86 |
| 3/25/2008 to 5/23/2008 | 59 | 729 | 242.33 | 1.0625 | 257.48 | 314.86 |
| 1/22/2008 to 3/25/2008 | 63 | 2356 | 586.66 | 0.8825 | 517.73 | 617.05 |
| 1/22/2008 to 3/25/2008 | 63 | 2356 | 586.66 | 0.8825 | 517.73 | 617.05 |
| 12/21/2007 to 1/22/2008 | 31 | 1162 | 1323.56 | 0.7287 | 964.48 | 1135.40 |
| 12/21/2007 to 1/22/2008 | 31 | 1162 | 1323.56 | 0.7287 | 964.48 | 1135.40 |
| 11/21/2007 to 12/21/2007 | 30 | 1074 | 24.36 | 0.6667 | 16.24 | 31.03 |
| 10/23/2007 to 11/21/2007 | 29 | 524 | 23.34 | 0.6937 | 16.19 | 30.88 |
| 9/21/2007 to 10/23/2007 | 32 | 103 | 25.35 | 0.6675 | 16.92 | 31.85 |
| 7/24/2007 to 9/21/2007 | 59 | 31 | 47.65 | 0.6934 | 33.04 | 62.59 |
| 5/23/2007 to 7/24/2007 | 62 | 17 | 100.28 | 0.8475 | 84.99 | 121.97 |
| 2/22/2007 to 5/23/2007 | 90 | 1501 | 145.87 | 0.8355 | 121.87 | 176.59 |
| 1/22/2007 to 2/22/2007 | 31 | 1469 | 49.53 | 0.7040 | 34.87 | 52.89 |
| 12/21/2006 to 1/22/2007 | 31 | 896 | 168.15 | 0.6700 | 112.66 | 144.51 |
| 11/22/2006 to | 29 | 751 | 46.59 | 0.6328 | 29.48 | 46.78 |

https://www3.nicor.com/MyAccount/GasUsagetable.aspx

5/27/2008

**Gas Usage Table - Nicor**

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/21/2006 | | | | | | |
| 10/23/2006 to 11/22/2006 | 29 | 616 | 27.37 | 0.5170 | 14.15 | 28.78 |
| 9/25/2006 to 10/23/2006 | 28 | 309 | 44.61 | 0.4721 | 21.06 | 37.71 |
| 7/25/2006 to 9/25/2006 | 62 | 45 | 51.71 | 0.5065 | 26.19 | 53.56 |
| 5/25/2006 to 7/25/2006 | 61 | 22 | 16.23 | 0.5120 | 8.31 | 30.48 |
| 4/25/2006 to 5/25/2006 | 29 | 233 | 15.21 | 0.6200 | 9.43 | 22.15 |
| 3/27/2006 to 4/25/2006 | 29 | 326 | 46.64 | 0.6619 | 30.87 | 48.14 |
| 2/22/2006 to 3/27/2006 | 33 | 935 | 365.04 | 0.7273 | 265.49 | 321.42 |
| 1/23/2006 to 2/22/2006 | 30 | 1055 | 38.53 | 0.9849 | 37.95 | 54.81 |
| 12/22/2005 to 1/23/2006 | 32 | 954 | 234.78 | 1.1025 | 258.84 | 303.69 |
| 11/22/2005 to 12/22/2005 | 30 | 1254 | 30.33 | 1.1480 | 34.82 | 50.77 |
| Totals | | 20609 | 5506.67 | WACOG: $0.80 | $4,852.75 | $6,785.22 |

©2008 Nicor Inc. | Terms of Use

Careers | Contact Us | FAQs | Site Map | Search | En Español

Saani

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| **2004** | | | |
| Jan 6 | 2300 | Com Ed | $200.00 |
| Feb 15 | 3087 | Nicor Gas | $200.00 |
| Feb 15 | 3010 | Com Ed | $200.00 |
| Feb 15 | 3011 | Flossmoor | $100.00 |
| Mar 8 | 3017 | Nicor Gas | $200.00 |
| May 1 | 3024 | Cook County | $3,137.15 |
| May 18 | 3027 | Nicor Gas | $300.00 |
| Jun 8 | 3030 | Com Ed | $200.00 |
| July 4 | 3036 | Emilio Rojas | $200.00 |
| July 16 | 3040 | Com Ed | $400.00 |
| July 31 | 3043 | Flossmoor | $350.00 |
| Aug 2 | 3045 | Flossmoor | $200.00 |
| Aug 8 | 3048 | Com Ed | $200.00 |
| Aug 8 | 3049 | Emilio Rojas | $100.00 |
| Aug 8 | 3050 | Emilio Rojas | $200.00 |
| Aug 10 | 3052 | Homewood Disposal | $50.00 |
| Nov 2 | 3071 | Flossmoor | $200.00 |
| Nov 2 | 3073 | Cook County | $10,448.18 |
| **2005** | | | |
| Feb 6 | 3095 | Cook County | $6,449.80 |
| Aug 21 | 3129 | Com Ed | $400.00 |
| Oct 16 | 3138 | Cook County | $6,931.88 |
| Nov 2 | 3141 | Flossmoor | $200.00 |
| Nov 22 | 3146 | Emilio Rojas | $240.00 |
| Dec 1 | 3152 | Com Ed | $200.00 |
| Dec 5 | 3154 | Nicor Gas | $500.00 |
| **2006** | | | |
| Feb 8 | 3165 | Cook County | $6,690.84 |
| Mar 6 | 3171 | Nicor Gas | $300.00 |
| Apr 3 | 3178 | Com Ed | $300.00 |
| Apr 7 | 3181 | Nicor Gas | $500.00 |
| May 20 | 3188 | Flossmoor | $400.00 |
| Jul 22 | 3203 | Emilio Rojas | $330.00 |
| Aug 19 | 3215 | Cook County | $6,527.75 |
| Aug 23 | 3218 | Flossmoor | $1,000.00 |
| Aug 29 | 3221 | Com Ed | $500.00 |
| **2007** | | | |
| Feb 3 | 3231 | Emilio Rojas | $350.00 |
| Feb 8 | 3232 | Flossmoor | $500.00 |
| Feb 18 | 3234 | Cook County | $6,609.28 |
| Apr 4 | 3242 | Chenlawn | $48.00 |
| Apr 29 | 3250 | Chenlawn | $48.00 |
| May 30 | 3254 | Chenlawn | $79.00 |
| May 30 | 3255 | Com Ed | $600.00 |
| Jun 10 | 3257 | Chenlawn | $48.00 |
| Jul 7 | 3264 | Chenlawn | $48.00 |
| Jul 10 | 3267 | Chenlawn | $48.00 |
| Jul 17 | 3268 | Chenlawn | $48.00 |
| Aug 24 | 3270 | True Green | $32.00 |
| Aug 24 | 3272 | Homewood Disposal | $100.00 |
| Aug 24 | 3274 | Chenlawn | $79.00 |
| Sep 3 | 3278 | Com Ed | $1,000.00 |
| Sep 16 | 3281 | True Green | $20.00 |
| Sep 24 | 3284 | Chenlawn | $48.00 |
| Nov 11 | 3290 | Emilio Rojas | $840.00 |
| Nov 21 | 3293 | Cook County | $6,089.86 |
| Dec 9 | 3295 | Homewood Disposal | $40.51 |
| **2008** | | | |
| Feb 13 | 3302 | Cook County | $6,349.57 |
| Apr 7 | 3313 | Flossmoor | $40.00 |
| | | | $71,420.82 |

# HORIZON HEALTHCARE ASSOCIATES, S.C.

*Olympia Fields Internal Medicine Associates, S.C., D/B/A*

19550 S. Governors Highway • Suite 2000 • Flossmoor, IL 60422 • Phone (708) 957-8750 • Fax (708) 957-8602

**Internal Medicine**
Alexander S. White, M.D., Emeritus
Romuald C. Warakomski, D.O.
Karen N. Whitehorn, M.D.

**Family Practice**
Peter J. Iagmin, M.D.
Bruce A. Parisi, M.D.
Maurice J. Halpin, D.O.

**Nephrology**
Michael R. Peck, M.D.
Daniel A. Yohay, M.D.
Kenneth N. Cline, M.D.
Lourdes R. Terrado, M.D.

**Endocrinology**
Ilene Weintraub Yohay, M.D.

FAX:  708-957-8602          708-614-6556          708-957-3906
      708-957-4585                                708-957-4905

## FAX

Date: 5-27-08

TO: Barb Saani QM 211

COMPANY:

FAX NUMBER: 718-322-2533

FROM: Beth - Dr Whitehorn's office

NUMBER OF PAGES: 1
(Including cover page)

Regarding: Tijani Saani

---

Tijani Saani

has an appointment on

Mon.___ Tues.___ Wed.___ Thurs.___ Fri.___

5-15-08    AT 9:15 A.M.

IF UNABLE TO KEEP APPOINTMENT KINDLY GIVE 24 HRS. NOTICE
Phone (708) 957-8750

---

Tijani Saani

has an appointment on

Mon.___ Tues.___ Wed.___ Thurs.___ Fri.___

1-29-07    AT 11:15 A.M.

IF UNABLE TO KEEP APPOINTMENT KINDLY GIVE 24 HRS. NOTICE
Phone (708) 957-8750

---

The information contained in this transmission is confidential information intended for the use of the individual or entity named above.  If the reader of this message is not the recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone, and return the original transmission to us at the above address via US Postal Service.  Thank you.
11/05REV.

Satellite Offices: 1851 Sibley Boulevard • Calumet City, IL 60409 — 6703 W. 159th St. • Tinley Park, IL 60477

*Attn: Patty*

FAX

Date: 5/28/08

TO: Barbara Saani

COMPANY: _____

FAX NUMBER: 718-322-2533

FROM: Diane (708) 957-6307 Direct No.

NUMBER OF PAGES: 5 Sheets
(Including cover page)

Regarding: Barbara Saani.

Comments: Medical Records.
These are payments made to
Horizon health care for services I've
rec'd from Dr. Whitehorn in Flossmoor...

The information contained in this transmission is confidential information intended for the use of the individual or entity named above.  If the reader of this message is not the recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this transmission in error, please notify us immediately by telephone, and return the original transmission to us at the above address via US Postal Service. Thank you.
11/05REV,

```
05/28/2008  08:45   7089573906              HORIZON HEALTHCARE                        PAGE  02/05


TIENT ACCOUNT INQUIRY        Horizon Healthcare Assoc.,S.C.      05/27/08
er: 0013                                                        User: 00013
5545 SAANI, BARBARA R      (708) 957-7604
    PSC 1208   BOX 142   APO, AE   09800


    Ins BCPPO   Ins 2       Ins 3       Budget
            Current   30 Day   60 Day   90 Plus   Total
    Priv      .00      .00      .00      .00      .00
    Ins.      .00      .00      .00      .00      .00
    Other     .00      .00      .00      .00      .00
                                                 .00

marks 0064010           BCBS PPO


o Date Prev Ticket Procedure Diagnosis  Fee    Billed   Open   Ins   A

/15/07 34   1457676 992;325   25002   81.25 08/22/07    .00 BAL    M
            Pmt Date  Trans. Description         Type   Amount Reference

        10/03/07 RB    REBILL              D       .00
        10/05/07 BCP   B.UE SHIELD PMT     P     -55.00
        10/05/07 AHMO  ADJUST HMO/PPO      A     -11.25
        10/05/07 OBCPPO TRANSFER FROM BCPPO O    -15.00
        10/05/07 IBAL  TRANSFER TO BAL     T      15.00
        10/05/07 PEC   POSTING ADJ CREDIT  A     -15.00


o Date Prev Ticket Procedure Diagnosis  Fee    Billed   Open   Ins   A

/15/07 34   1457676 A0650    V7231    71.00 08/22/07    .00 BCPPO Y
            Pmt Date  Trans. Description         Type   Amount Reference

        10/03/07 RB    REBILL              D       .00
        10/15/07 AHMO  ADJUST HMO/PPO      A     -71.00
        10/15/07 AHMO  ADJUST HMO/PPO      A      71.00
        10/15/07 BCP   BLUE SHIELD PMT     P     -63.90
        10/15/07 AHMO  ADJUST HMO/PPO      A      -7.10


o Date Prev Ticket Procedure Diagnosis  Fee    Billed   Open   Ins   A

/15/07 34   1457677 603200W  V7641    31.00 08/22/07    .00 BCPPO Y
            Pmt Date  Trans. Description         Type   Amount Reference

        10/03/07 RB    REBILL              D       .00
        10/05/07 BCP   BLUE SHIELD PMT     P     -20.00
        10/05/07 AHMO  ADJUST HMO/PPO      A     -11.00


o Date Prev Ticket Procedure Diagnosis  Fee    Billed   Open   Ins   A

/15/07 34   1457676 083142    V7231     .00 08/22/07    .00 BCPPO Y


o Date Prev Ticket Procedure Diagnosis  Fee    Billed   Open   Ins   A

7/18/07 34  1453174 99199    N/C      .00              .00 P    M


o Date Prev Ticket Procedure Diagnosis  Fee    Billed   Open   Ins   A

7/09/07 34  1452265 99999    N/C      .00 07/16/07    .00 P    M
```

05/28/2008  08:45   7089573906                HORIZON HEALTHCARE                    PAGE  03/05

| Pat Date | Trans. | Description | Type | Amount | Reference |
|---|---|---|---|---|---|
| 07/19/07 | COPAY | CO-PAY | P | -15.00 CASH | |
| 10/05/07 | PED | POST ADJ DEBIT | A | 15.00 | |

| ; Date | Prov | Ticket | Procedure | Diagnosis | Fee | Billed | Open | Ins | A |
|---|---|---|---|---|---|---|---|---|---|
| /02/07 | 34 | 1458598 | 99213 | 25093 | 81.25 | 07/05/07 | .00 | BCPPO | Y |

| Pat Date | Trans. | Description | Type | Amount | Reference |
|---|---|---|---|---|---|
| 07/05/07 | COPAY | CO-PAY | P | -15.00 CASH | |
| 08/14/07 | BCP | BLUE SHIELD PMT | P | -55.00 | |
| 08/14/07 | AHMO | ADJUST HMO/PPO | A | -11.25 | |

| c Date | Prov | Ticket | Procedure | Diagnosis | Fee | Billed | Open | Ins | A |
|---|---|---|---|---|---|---|---|---|---|
| /25/07 | 34 | 1448565 | 992?325 | 25003 | 81.25 | 06/27/07 | .00 | BCPPO | Y |

| Pat Date | Trans. | Description | Type | Amount | Reference |
|---|---|---|---|---|---|
| 05/28/07 | COPAY | CO-PAY | P | -15.00 MC | |
| 08/02/07 | COPAY | CO-PAY | P | .34 FEE | |
| 08/02/07 | CCF | CREDIT CARD FEE | A | -.34 | |
| 08/14/07 | RB | REBILL | D | .00 | |
| 10/03/07 | RB | REBILL | D | .00 | |
| 10/15/07 | BCP | BLUE SHIELD PMT | P | -51.00 | |
| 10/15/07 | AHMO | ADJUST HMO/PPO | A | -15.25 | |

| c Date | Prov | Ticket | Procedure | Diagnosis | Fee | Billed | Open | Ins | A |
|---|---|---|---|---|---|---|---|---|---|
| /25/07 | 34 | 1448966 | 83037 | 25009 | 78.00 | 06/27/07 | .00 | BAL | N |

| Pat Date | Trans. | Description | Type | Amount | Reference |
|---|---|---|---|---|---|
| 08/14/07 | RB | REBILL | D | .00 | |
| 10/03/07 | RB | REBILL | D | .00 | |
| 10/15/07 | BCP | BLUE SHIELD PMT | P | -32.00 | |
| 10/15/07 | AHMO | ADJUST HMO/PPO | A | -42.50 | |
| 10/15/07 | DBCPPO | TRANSFER FROM BCPPO | D | -3.50 | |
| 10/15/07 | JBAL | TRANSFER TO BAL | T | 3.50 | |
| 12/20/07 | SMBAL | SMALL BALANCE W/O | A | -3.50 | |

| e Date | Prov | Ticket | Procedure | Diagnosis | Fee | Billed | Open | Ins | A |
|---|---|---|---|---|---|---|---|---|---|
| )/25/07 | 34 | 1448967 | 82962 | 25009 | 25.50 | 06/27/07 | .00 | BAL | N |

| Pat Date | Trans. | Description | Type | Amount | Reference |
|---|---|---|---|---|---|
| 08/14/07 | RB | REBILL | D | .00 | |
| 10/03/07 | RB | REBILL | D | .00 | |
| 10/15/07 | BCP | BLUE SHIELD PMT | P | -2.70 | |
| 10/15/07 | AHMO | ADJUST HMO/PPO | A | -22.50 | |
| 10/15/07 | DBCPPO | TRANSFER FROM BCPPO | D | -.30 | |
| 10/15/07 | TBAL | TRANSFER TO BAL | T | .30 | |
| 12/20/07 | SMBAL | SMALL BALANCE W/O | A | -.30 | |

| /e Date | Prov | Ticket | Procedure | Diagnosis | Fee | Billed | Open | Ins | A |
|---|---|---|---|---|---|---|---|---|---|
| ?/05/07 | 34 | 1426418 | 99782 | 4659 | 105.75 | 05/16/07 | .00 | BAL | N |

```
      Pmt Date  Trans. Description        Type  Amount  References
      -----------------------------------------------------------
      02/06/07  CDPAY  CK-PAY             P    -16.00 CASH
      02/19/07  RB     REBILL             D      .00
      09/05/07  RB     REBILL             D      .00
      05/15/07  OBCBS  TRANSFER FROM BCBS  0    -90.75
      05/15/07  IBCPPO TRANSFER TO BCPPO   I     90.75
      07/06/07  RB     REBILL             D      .00
      07/06/07  OBCPPO TRANSFER FROM BCPPO  0    -90.75
      07/06/07  IBAL   TRANSFER TO BAL     I     90.75
      08/06/07  BCP    BLUE SHIELD PMT     P    -67.00
      08/06/07  AHMO   ADJUST HMO/PPO      A    -23.75

o Date Prov  Ticket  Procedure  Diagnosis  Fee   Billed    Open    Ins   A
------ ---- ------- -------- ------- ------ ------- ------- ---- -
/12/03 26   1179381 992.3     4019    68.00 06/26/03    .00 BAL    N
      Pmt Date  Trans. Description        Type  Amount  Reference
      ------------------------------------------------------------
      06/18/03  BCP    BLUE SHIELD PMT     P     .00 NON COV
      06/18/03  OBCPP2 TRANSFER FROM BCPP2  0    -68.00
      06/18/03  IBAL   TRANSFER TO BAL     I     68.00
      06/25/03  BCP    BLUE SHIELD PMT     P    -49.00
      06/25/03  AHMO   ADJUST HMO/PPO      A     -4.00
      06/25/03  OBAL   TRANSFER FROM BAL   0    -15.00
      06/25/03  IBAL   TRANSFER TO BAL     I     15.00
      07/28/03  CCP    CREDIT CARD PMT     P    -15.00 MASTERCARD

o Date Prov  Ticket  Procedure  Diagnosis  Fee   Billed    Open    Ins   A
------ ---- ------- -------- ------- ------ ------- ------- ---- -
/17/03 26   1178594 71020     7962    99.00 05/29/03    .00 BAL    N
      Pmt Date  Trans. Description        Type  Amount  Reference
      ------------------------------------------------------------
      05/22/03  BCP    BLUE SHIELD PMT     P     .00 DED
      05/22/03  AHMO   ADJUST HMO/PPO      A    -55.00
      05/22/03  OBCPP2 TRANSFER FROM BCPP2  0    -44.00
      05/22/03  IBAL   TRANSFER TO BAL     I     44.00
      08/30/03  CK     CHECK PMT THANK YOU P    -44.00 CK#2229/107.00

o Date Prov  Ticket  Procedure  Diagnosis  Fee   Billed    Open    Ins   A
------ ---- ------- -------- ------- ------ ------- ------- ---- -
/17/03 26   1173595 76032     V7612  127.00 04/18/03    .00 BCPP2  Y
      Pmt Date  Trans. Description        Type  Amount  Reference
      ------------------------------------------------------------
      05/22/03  BCP    BLUE SHIELD PMT     P   -107.00
      05/22/03  AHMO   ADJUST HMO/PPO      A    -20.00

o Date Prov  Ticket  Procedure  Diagnosis  Fee   Billed    Open    Ins   A
------ ---- ------- -------- ------- ------ ------- ------- ---- -
/17/03 26   1173596 72050     7210   156.00 05/29/03    .00 BAL    N
      Pmt Date  Trans. Description        Type  Amount  Reference
      ------------------------------------------------------------
      05/22/03  BCP    BLUE SHIELD PMT     P     .00 DED
      05/22/03  AHMO   ADJUST HMO/PPO      A    -93.00
      05/22/03  OBCPP2 TRANSFER FROM BCPP2  0    -63.00
      05/22/03  IBAL   TRANSFER TO BAL     I     63.00
      08/30/03  CK     CHECK PMT THANK YOU P    -63.00 CK#2229/107.00

o Date Prov  Ticket  Procedure  Diagnosis  Fee   Billed    Open    Ins   A
------ ---- ------- -------- ------- ------ ------- ------- ---- -
/19/03 26   1168466 99205     4871   219.00 06/01/03    .00 BAL    N
```

05/28/2008  08:45   7009573906                    HORIZON HEALTHCARE              PAGE  05/05

| Pmt Date | Trans. | Description | Type | Amount | Reference |
|----------|--------|-------------|------|--------|-----------|
| 04/20/03 | BCP | BLUE SHIELD PMT | P | -196.00 | |
| 04/28/03 | ADBO | ADJUST HMO/PPO | A | -0.00 | |
| 04/28/03 | UBCPP7 | TRANSFER FROM BCPP2 | Q | -15.00 | |
| 04/28/03 | IBAL | TRANSFER TO BAL | I | 15.00 | |
| 05/21/03 | CK | CHECK PMT THANK YOU | P | -15.00 | CK#2292 |



**PARK FOREST PUBLIC LIBRARY / 400 LAKEWOOD BLVD.**
**PARK FOREST, IL 60466 / 748-3731**

This card valid for system-wide use
**SUBURBAN LIBRARY SYSTEM**

**VALID THROUGH**    APRIL    2008

Barbara Saani
20800 Corinth
Olympia Fields, IL 60461



### CONDITIONS

1. The individual who signed the registration form accepts full responsibility for everything borrowed on this card.
2. This card must be presented each time materials are borrowed.
3. Parents are responsible for their children's materials.
4. Loss of card or change of address must be reported immediately.
5. There is a replacement charge for lost or damaged cards.
6. This card remains the property of the Park Forest Public Library and must be returned upon request.

| APPLICATION FOR SHIPMENT AND/OR STORAGE OF PERSONAL PROPERTY (Read Privacy Act Statement on back before completing form.) | 1. DATE PREPARED (rr YYMMDD) 20080505 | 2. SHIPMENT NUMBER 1 OF 1 |
|---|---|---|

**3. NAME OF PREPARING OFFICE**
TRANSPORTATION OFFICE
ASG-KU APO AE 09366

**4. TO** (Responsible Origin Personal Property Shipping Office)
**a. NAME**
*********************SAME***********************

**5. NAME OF DESTINATION PERSONAL PROPERTY SHIPPING OFFICE**
FAMILY WELCOME CENTER NTC, PPO,
1710 B CAVIN DR BLDG 8100 GREAT LAKES, IL 60088

**b. ADDRESS** (Street, Suite Number, City, State, ZIP Code)
*****************SAME*********************

**6. MEMBER OR EMPLOYEE INFORMATION**

| a. NAME (Last, First, Middle Initial) SAANI, TIJANI A. | b. RANK/GRADE YC-02 | c. SSN | d. AGENCY DOD |
|---|---|---|---|

**7. REQUEST ACTION BE TAKEN TO TRANSPORT OR STORE THE FOLLOWING:**

**a. HOUSEHOLD GOODS/UNACCOMPANIED BAGGAGE/ITEMS/NO. OF CONTAINERS** (Enter quantity estimate)

| (1) POUNDS 10000 | (2) POUNDS OF PROFESSIONAL BOOKS, PAPERS, AND EQUIPMENT (PBP&E) (Enter "NONE" if not applicable) | (3) EXPENSIVE AND VALUABLE ITEMS (Number of cartons) |
|---|---|---|

**b. MOBILE HOME INFORMATION** (Enter dimensions in feet and inches)

| (1) SERIAL NUMBER | (2) LENGTH | (3) WIDTH | (4) HEIGHT | (5) TYPE EXPANDO (Describe) |
|---|---|---|---|---|

**c. MOBILE HOME SERVICES REQUESTED** (X as applicable)

| CONTENTS PACKED | MOBILE HOME BLOCKED | MOBILE HOME UNBLOCKED | STORED AT ORIGIN | STORED AT DESTINATION |
|---|---|---|---|---|

**8. THIS SHIPMENT/STORAGE IS REQUIRED INCIDENT TO THE FOLLOWING CHANGE OF STATION ORDERS:**

| a. TYPE ORDERS (X one) [X] PERMANENT  [ ] TEMPORARY | b. ISSUED BY RANDOLPH AFB, TX 78150-0000 | c. NEW DUTY ASSIGNMENT DOBBINS AFB, GA |
|---|---|---|
| d. DATE OF ORDERS (YYYYMMDD) 20080424 | e. ORDERS NUMBER CP-0765 | f. PARAGRAPH NO. | g. IN TRANSIT TELEPHONE NO. (Include Area Code) |

**h. IN TRANSIT ADDRESS** (Street, Apartment Number, City, State, ZIP Code)

| 9. PICKUP (ORIGIN) INFORMATION | 10. DESTINATION INFORMATION |
|---|---|
| a. ADDRESS (Street, Apartment Number, City, County, State, ZIP Code) (If a mobile home park, include mobile home court name) BAYAN, BLK 13, ST 13 VILLA 49 ASG-KU APO AE 09366 | a. ADDRESS (Street, Apartment Number, City, County, State, ZIP Code) (If a mobile home park, include mobile home court name) 1442 KINROSS ST (COOK CO.) FLOSSMOOR, IL 60422 |
| b. TELEPHONE NUMBER (Include Area Code) CELL: 729-9037 | b. AGENT DESIGNATED TO RECEIVE PROPERTY Barbara B. Saani |

| 11. EXTRA PICKUP/DELIVERY ADDRESS (If applicable) | 12. SCHEDULED DATE FOR (YYYYMMDD) |
|---|---|
| | a. PACK 20080521 | b. PICKUP | c. DELIVERY |

**13. REMARKS**
MBR NEEDS TO BE AVAILABLE BTW THE HOURS OF 8-5 FOR PACK/PICKUP. NO FIREARMS IN SHIPMENT. CALL OUR OFFICE FOR CANCEL/RESCHEDULE. ONCE AT NDS, CALL THE TRANSPORTATION OFFICE FOR DELIVERY
MEMBER NEEDS A PRE MOVE SURVEY DONE ON 06 MAY 2008

**14. I CERTIFY THAT NO OTHER SHIPMENTS AND/OR NONTEMPORARY STORAGE HAVE BEEN MADE UNDER THESE ORDERS EXCEPT AS INDICATED BELOW** (If none, indicate "NONE.")

| a. FROM | b. TO | c. NET POUNDS (Actual or estimated) | d. POUNDS OF PBP&E (Actual or estimated) |
|---|---|---|---|
| NONE | NONE | | |
| | | | |
| | | | |

**15. CERTIFICATION OF SHIPMENT RESPONSIBILITIES/STORAGE CONDITIONS**
I certify that I have read and understand my shipping responsibilities and storage conditions printed on the back side of this form.

| a. SIGNATURE OF MEMBER/EMPLOYEE SAANI, TIJANI A. | b. DATE SIGNED 20080505 | c. ADDRESS OF CONTRACTOR (Street, Suite No., City, State, ZIP Code) |
|---|---|---|
| d. NAME OF CONTRACTOR (Origin DPM or non-temporary storage) | | |

**16. CERTIFICATE IN LIEU OF SIGNATURE** IS REQUIRED WHEN REGULATIONS SO AUTHORIZE. Property is baggage, household goods, mobile home, and is shipped at government expense.

**a. REASON FOR NONAVAILABILITY OF**

**GLOBAL FREIGHT SYSTEMS CO.** W.L.L.

**Venkatesh Sharma**
Manager - Exports

P.O. Box : 22389 Safat 13084 Kuwait
Tel : 4316530
Fax : 4319177 - 4316478
Cell : 9736327
E-mail : venkatesh@global-freight.net
www.global-freight.net
International Freight Forwarders & Worldwide Removals

**DD FORM 1299, SEP 1998**